No. 23-60408

# In the United States Court of Appeals for the Fifth Circuit

---

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

JESSIE BULLOCK,
Defendant–Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
No. 18-CR-165 (HON. CARLTON W. REEVES)

---

## OPENING BRIEF FOR THE UNITED STATES

---

TODD W. GEE
United States Attorney

GAINES CLEVELAND
Appellate Chief

JENNIFER CASE
Deputy Appellate Chief
Southern District of Mississippi

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

**STATEMENT REGARDING ORAL ARGUMENT**

Because this Court has not yet addressed a preserved Second Amendment challenge to 18 U.S.C. § 922(g)(1) after *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the government believes oral argument would be helpful to the Court.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.....................................i

TABLE OF CONTENTS ..........................................................................ii

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT............................................................2

STATEMENT OF THE ISSUES ...............................................................2

STATEMENT OF THE CASE ..................................................................2

    I.    Alleged Offense Conduct ...........................................................3

    II.   Procedural History.....................................................................5

    III.  Decision Below ........................................................................7

SUMMARY OF ARGUMENT .................................................................9

ARGUMENT ........................................................................................12

    I.    The district court erred by concluding that *Bruen* "expressly abrogated" this Court's pre-*Bruen* precedents upholding Section 922(g)(1) under the Second Amendment. ......................12

        A.    Before *Bruen*, this Court upheld Section 922(g)(1) under the Second Amendment...................................................13

        B.    *Bruen* did not "unequivocally" or "expressly" abrogate this Court's prior decisions. .............................................15

        C.    The district court erred by holding that *Bruen* "expressly abrogated" this Court's pre-*Bruen* precedent. ....................18

    II.   Even if *Bruen* Abrogated Circuit Precedent, Section 922(g)(1) Comports With the Second Amendment...................................21

A.    The Second Amendment's text as historically understood makes plain that Section 922(g)(1) is constitutional as applied to Bullock, a convicted felon. ..... 22

B.    Our Nation has a long-standing tradition of firearm regulation. ....................................................................... 28

C.    The historical tradition of firearm regulation supports disarming all felons. ........................................................... 38

D.    Our historical tradition of firearm regulation unquestionably permits disarming demonstrably dangerous felons like Bullock. ......................................... 40

E.    The district court made a series of errors in finding Section 922(g)(1) unconstitutional as applied to Bullock. ....................................................................... 42

CONCLUSION ......................................................................... 49

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Barrett v. United States*,
    423 U.S. 212 (1976) .......................................................................38, 42

*Baze v. Rees*,
    553 U.S. 35 (2008) ............................................................................. 29

*Binderup v. Att'y Gen.*,
    836 F.3d 336 (3d Cir. 2016) (en banc) ..............................................31, 38

*Campbell v. Sonat Offshore Drilling, Inc.*,
    979 F.2d 1115 (5th Cir. 1992) .........................................................12, 21

*Dickerson v. New Banner Institute, Inc.*,
    460 U.S. 103 (1983) .......................................................................38, 42

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................. passim

*Folajtar v. Attorney General*,
    980 F.3d 897 (3d Cir. 2020) ............................................................31, 40

*Gearlds v. Entergy Servs., Inc.*,
    709 F.3d 448 (5th Cir. 2013) ............................................................. 46

*Hamilton v. Pallozzi*,
    848 F.3d 614 (4th Cir. 2017) ............................................................. 39

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ............................................................. 46

*In re Bonvillian Marine Serv., Inc.*,
    19 F.4th 787 (5th Cir. 2021) ...............................................12, 16, 17, 18

*Kamen v. Kemper Financial Services, Inc.*,
    500 U.S. 90 (1991) ........................................................................... 44

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ............................................................31, 40

*Lewis v. United States*,
  445 U.S. 55 (1980)................................................................................ 38

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ........................................................................16, 25

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019)........................................................23, 28

*National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco,*
  *Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ................................. 18

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)................................................................... passim

*Patterson v. Winn*,
  30 U.S. (5 Pet.) 233 (1831) ................................................................ 32

*Range v. Att'y Gen.*,
  69 F.4th 96 (3d Cir. 2023) ................................................................40, 45

*Respublica v. Donagan*,
  2 Yeates 437 (Pa. 1799).......................................................................... 35

*Richardson v. Ramirez*,
  418 U.S. 24 (1974).................................................................................. 24

*Robertson v. Baldwin*,
  165 U.S. 275 (1897) ............................................................................. 22

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ............................................................................. 43

*Spencer v. Kemna*,
  523 U.S. 1 (1998)................................................................................... 24

*State v. Davis*,
  5 S.C.L. (3 Brev.) 3 (S.C. Const. Ct. App. 1811) ..................................... 35

*State v. Hogan*,
    58 N.E. 572 (Ohio 1900) ........................................................................ 38

*State v. Shelby*,
    2 S.W. 468 (Mo. 1886) .......................................................................... 37

*Tennessee v. Garner*,
    471 U.S. 1 (1985) .................................................................................... 29

*Teter v. Lopez*,
    76 F.4th 938 (9th Cir. 2023) .................................................................. 44

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
    837 F.3d 678 (6th Cir. 2016) (en banc) ................................................ 24

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ................................................................ 26

*United States v. Anderson*,
    559 F.3d 348 (5th Cir. 2009) ...........................................................15, 18

*United States v. Barton*,
    633 F.3d 168 (3d Cir. 2011) ................................................................... 38

*United States v. Bena*,
    664 F.3d 1180 (8th Cir. 2011) ............................................................... 24

*United States v. Betancourt*,
    No. 21-cr-229, 2023 WL 5917415 (S.D. Tex. Sept. 11, 2023) ................... 20

*United States v. Carpio-Leon*,
    701 F.3d 974 (4th Cir. 2012) ................................................................. 24

*United States v. Daniels*,
    77 F.4th 337 (5th Cir. 2023) ...................................................... 30, 40, 45

*United States v. Darrington*,
    351 F.3d 632 (5th Cir. 2003) ...............................................10, 14, 15, 17

*United States v. Emerson*,
    270 F.3d 203 (5th Cir. 2001) ................................................................. 13

*United States v. Esparza,*
No. 21-cr-144, 2023 WL 5659051 (W.D. Tex. Aug. 31, 2023) ................ 20

*United States v. Everist,*
368 F.3d 517 (5th Cir. 2004) ..................................................... 14, 15, 38

*United States v. Fulwiler,*
No. 23-30152, 2023 WL 7118748 (5th Cir. Oct. 27, 2023) ...................... 19

*United States v. Garza,*
No. 22-51021, 2023 WL 4044442 (5th Cir. June 15, 2023)...................... 18

*United States v. Gonzalez,*
No. 22-1242, 2022 WL 4376074 (7th Cir. Sept. 22, 2022) ...................... 40

*United States v. Herrera,*
No. 20-cr-692, 2023 WL 5917414 (S.D. Tex. Sept. 11, 2023) .................. 20

*United States v. Hickcox,*
No. 22-50365, 2023 WL 3075054 (5th Cir. April 25, 2023)...................... 19

*United States v. Jackson,*
--- F. Supp. 3d ---, 2023 WL 6881818 (N.D. Miss. Oct. 18, 2023) ............. 20

*United States v. Jeffery,*
No. 21-cr-437, 2023 WL 4629556 (W.D. Tex. July 19, 2023) ................. 21

*United States v. Jimenez-Shilon,*
34 F.4th 1042 (11th Cir. 2022)................................................... 24

*United States v. Johnson,*
No. 22-20300, 2023 WL 3431238 (5th Cir. May 12, 2023)...................... 19

*United States v. Locket,*
No. 22-cr-72, 2023 WL 5153549 (W.D. Tex. Aug. 10, 2023) .................. 20

*United States v. Mares,*
402 F.3d 511 (5th Cir. 2005) ................................................... 14

*United States v. Massey,*
849 F.3d 262 (5th Cir. 2017) ................................................... 15

*United States v. Melendrez-Machado*,
   --- F. Supp. 3d ---, 2023 WL 4003508 (W.D. Tex. June 14, 2023) ............. 21

*United States v. Mosely*,
   No. 22-cr-620, 2023 WL 4765596 (S.D. Tex. July 26, 2023) ................... 21

*United States v. Pickett*,
   No. 22-11006, 2023 WL 3193281 (5th Cir. May 2, 2023) ....................... 19

*United States v. Racliff*,
   No. 22-10409, 2023 WL 5972049 (5th Cir. Sept. 14, 2023) ..................... 19

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) .............. passim

*United States v. Robinson*,
   No. 21-cr-159, 2023 WL 4304762 (N.D. Tex. June 29, 2023) ................. 21

*United States v. Roy*,
   No. 22-10677, 2023 WL 3073266 (5th Cir. April 25, 2023) ..................... 19

*United States v. Scroggins*,
   599 F.3d 433 (5th Cir. 2010) ................................................... 15

*United States v. Smith*,
   No. 22-10795, 2023 WL 5814936 (5th Cir. Sept. 8, 2023) ..................... 19

*United States v. Vongxay*,
   594 F.3d 1111 (9th Cir. 2010) ................................................. 24

*United States v. Washington*,
   No. 22-10574, 2023 WL 5275013 (5th Cir. Aug. 16, 2023) ..................... 19

*United States v. Yancey*,
   621 F.3d 681 (7th Cir. 2010) .................................................. 24

*United States v. Yates*,
   No. 21-cr-116, 2023 WL 5016971 (D. Idaho Aug. 7, 2023) ..................... 45

*United States v. Zelaya Hernandez*,
   --- F. Supp. 3d ---, 2023 WL 4161203 (N.D. Tex. June 23, 2023) ............. 21

*Vincent v. Garland*,
　80 F.4th 1197 (10th Cir. 2023) ................................................. 19

*Yee v. City of Escondido*,
　503 U.S. 519 (1992) ..................................................................... 44

**Statutes and Rules**

U.S. Const. amend. II ................................................................. 9, 21

18 U.S.C. § 922 .......................................................................... passim

18 U.S.C. § 924 ................................................................................. 3

18 U.S.C. § 3231 ............................................................................... 2

18 U.S.C. § 3731 ............................................................................... 2

28 U.S.C. § 1865 ............................................................................ 23

Fed. R. Evid. 201 ........................................................................... 45

Ky. Rev. Stat. § 237.110 ............................................................... 27

La. Rev. Stat. § 40:1379.3 ........................................................... 27

Miss. Code. Ann. § 45-9-101 ....................................................... 27

Tex. Gov't Code § 411.172 .......................................................... 27

**Other Authorities**

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ............. 33

4 William Blackstone, *Commentaries on the Laws of England* (1st ed. 1769) ........................................................................ 28, 35

6 *Documentary History* (John P. Kaminski & Gaspare J. Saladino eds., 2000) .................................................................................... 34

Akhil Reed Amar, *The Bill of Rights* (1998) .................................. 23

ix

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ................................................................................... 29

Bureau of Justice Statistics, *Recidivism of Prisoners Released in 24 States in 2008: A 10-Year Follow-Up Period (2008-2018)* ............................................. 41

David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354 (1982) ................. 30

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* (2d ed. 1792) ...................................................................................... 32

James Davis, *The Office and Authority of a Justice of Peace* (1774) ..................... 32

James Parker, *Conductor Generalis* (1764) ..................................................... 32

James Parker, *Conductor Generalis* (Robert Campbell printing 1792) .............. 32

James Parker, *Conductor Generalis* (Robert Hodge printing 1788) ................... 32

John Holmes, *The Statesman, or Principles of Legislation and Law* (1840) .......... 34

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) 31, 32, 40

Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* (1858) ................................................................. 35

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* (1773) ................................................................................... 32

Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* (John P. Kaminski & Gaspare J. Saladino eds., 2001) ....................................................................................... 34

Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) .......................... 36

*State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842 ................................................................................ 34

Stuart Banner, *The Death Penalty: An American History* (2002) ........................ 29

Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* (New Haven, Oliver Steele 1816) ........................................... 35

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) ................................................................................................ 23

United States Sentencing Commission, *Recidivism Among Violent Federal Offenders* (Jan. 2019) ........................................................................ 41

William Waller Hening, *The New Virginia Justice* (1795) ............................... 32

**Historical Statutes**

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879) ............................. 36, 37

1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments (1811) ............................................................................... 30

1702 Conn. Acts 91 .................................................................................... 35

2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) ......................................................................... 29

4 *Journals of the Continental Congress* 1774-1789 (Worthington Chauncey Ford ed., 1906) ........................................................................ 31

9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature (1821) ............................................................................................... 30

Act About Binding to the Peace, ch, 26, 1700 Pa. Laws 5 ............................ 35

Act About Binding to the Peace, ch. 4, 1700 Del. Laws 52 ........................... 35

Act Declaring the Mode of Proceeding in Certain Criminal Cases, ch. 30, § 16, 1789 Va. Laws 17-18 .................................................................. 35

Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* (John Russell Bartlett ed., 1862)...................... 31

Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* (Walter Clark ed., 1905)................................................................................................ 31

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221...................................... 37

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157 ................ 36

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 .................................................. 36

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 ............................... 37

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290 ......... 37

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 ................................................. 37

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881) ........................... 36

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 .................. 37

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170................................... 37

Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* (Charles J. Hoadly ed., 1890) ................ 30

Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1906) ........................................................ 33

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14 .............................. 36

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112................................. 36

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21 ...................... 37

Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* (1815) ......... 33

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17....................................... 36

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92 .................................. 36

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 ..................................... 36

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ...........................36, 37

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87 ................36, 37

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39........................................ 36

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 ............................................ 36

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112........................................ 36

Act of June 12, 1879, § 2, 1879 Ohio Laws 192 ........................................... 37

Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* (Albert Stillman
    Batchellor ed., 1904)................................................................................ 32

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144 ....................... 36

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890) ....................... 33

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355 ..................... 37

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws
    140 ............................................................................................................. 37

Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York* (2d ed.
    1807) .......................................................................................................... 33

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 ..................................... 36

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80 ........................................ 36

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879)....................... 37

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394....................... 37

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421............................ 37

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 ................................... 36

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274..........................37

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159 ...................36, 37

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468.........................36

Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* (1886)........................................31

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556 ...............................36

Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (William Waller Hening ed., 1821) .................................................31

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656 .................................36

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69......................................37

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297 .................37

Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* (1869) ...........................................................32

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 .................36

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30 ...................37

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67 ..............36

Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* (1794) ..........................................................................32

Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777)........................................................31

Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America (1767) ....................30

An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790) ..................................................................29

Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873) .................................................... 36

Mass. Rev. Stat. ch. 134, § 16 (1836) ............................................ 35

Miss. Rev. Code ch. 77, § 2964 (1880) ........................................... 37

Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674* (E.B. O'Callaghan ed., 1868) ................................... 33

Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801* (1902) ...................................................................... 31

## INTRODUCTION

Jessie Bullock has felony convictions for manslaughter, aggravated assault, attempted aggravated assault, and fleeing a law-enforcement officer. He was convicted of the first two offenses after he shot a bouncer in the stomach and, after firing indiscriminately into a crowd of bar patrons, killed a 19-year-old passerby. In 2018, Bullock admitted to possessing a firearm after he allegedly beat his wife, stripped her naked, pointed a pistol at her, and threatened to "blow her brains out." Bullock was charged under 18 U.S.C. § 922(g)(1), but the district court held that Bullock's firearm possession was protected by the Second Amendment. In doing so, the district court incorrectly determined that the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), overruled this Court's longstanding precedents upholding Section 922(g)(1) under the Second Amendment. The district court also dismissed the Supreme Court's repeated assurances that Congress may prohibit felons from possessing firearms as insignificant "dicta." These errors alone merit reversal. More than that, Section 922(g)(1) comports with our Nation's historical tradition of firearm regulation, particularly as applied to Bullock. The district court's contrary decision is a radical departure from this Court's precedent and from the unanimous decisions of other district courts within this circuit. This Court should reverse the district court's judgment.

## JURISDICTIONAL STATEMENT

The United States appeals from the district court's order dismissing the superseding indictment against Defendant-Appellee Jessie Bullock. The district court (Reeves, J.) had subject-matter jurisdiction under 18 U.S.C. § 3231. The court entered its order on June 28, 2023. ROA.239-315. The government filed a timely notice of appeal on July 28, 2023. ROA.316. This Court has jurisdiction under 18 U.S.C. § 3731. The Solicitor General has authorized this appeal.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred by holding that the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), "expressly abrogated" this Court's precedents holding that 18 U.S.C. § 922(g)(1)'s prohibition on firearm possession by convicted felons does not violate the Second Amendment.

2.     Whether the district court erred by concluding that 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to the defendant, who has convictions for multiple violent felonies.

## STATEMENT OF THE CASE

In October 2019, a grand jury in the Southern District of Mississippi returned a superseding indictment charging Jessie Bullock with unlawfully possessing a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1)

and 924(a)(2). ROA.324-325. Bullock moved to dismiss the indictment, arguing that, as applied to him, Section 922(g)(1) violated the Second Amendment. ROA.133-143. The district court granted Bullock's motion and dismissed the indictment with prejudice. ROA.239-315.

## I.    Alleged Offense Conduct[1]

In May 2018, officers with the Jackson Police Department responded to a call that Bullock "was holding his wife hostage at gunpoint." ROA.332-333. According to Bullock's wife, she and Bullock had gotten into an argument earlier in the day that "escalated to him . . . dragging her out of her car as she was trying to get . . . her[self] and her grandchild out of the house." ROA.334. Bullock's wife explained that once Bullock dragged her back inside the house, he "stripped her down," "told her to get into a bathtub," "held a gun to her head," and threatened that "if she left he would blow her brains out." ROA.334. Bullock then "showed her the cocked gun." ROA.334.[2]

Bullock's daughter recounted a similar version of events. ROA.335. She explained that she was at the gym when her brother called and said her parents

---

[1] The government recites these facts from testimony at Bullock's pre-trial detention hearing. ROA.327-383.

[2] Bullock's wife testified differently at Bullock's detention hearing. *See* ROA.340-353. At that time, she claimed that she and Bullock had gotten into a "verbal argument" but that he never pulled a firearm on her. ROA.351.

were arguing. ROA.335. When she got to her parents' house, she saw Bullock holding a gun "to her mom's head" and threatening to "blow [her mom's] brains out." ROA.335. Bullock then pointed the gun at his daughter as she tried to get her child (Bullock's grandchild) out of the house. ROA.335-336.

Bullock was arrested, and he later admitted to possessing a firearm in the house. ROA.333. Although he admitted to being "physical" with his wife "at earlier points in their marriage," Bullock denied holding her at gunpoint on the date of his arrest. ROA.333.

At the time of his arrest, Bullock had at least four prior felony convictions. ROA.352-353. The first two were 1994 convictions for manslaughter and aggravated assault stemming from a deadly bar fight in which Bullock shot an unarmed bar bouncer in the abdomen and, after firing "a barrage of bullets" into a crowd outside the car, killed a 19-year-old passerby. ROA.386; *see also* ROA.391-392. Bullock was sentenced to 20 years of imprisonment. ROA.386. In 2015, Bullock was convicted of attempted aggravated assault against a law enforcement officer and fleeing from law enforcement. ROA.387. Bullock received a suspended sentence of five years of imprisonment for this offense. *See* ROA.387.[3]

---

[3] Bullock also has multiple arrests for simple assault. ROA.386-387. The disposition of these offenses is unknown.

## II.    Procedural History

A grand jury in the Southern District of Mississippi returned an indictment charging Bullock with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). ROA.324. After the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Bullock moved to dismiss the indictment, arguing that Section 922(g)(1) violated the Second Amendment as applied to him. ROA.133-143. In response, the government argued that *Bruen* neither abrogated pre-existing Fifth Circuit precedent finding Section 922(g)(1) constitutional under the Second Amendment nor undermined the Supreme Court's assurances in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment right extends only to law-abiding, responsible citizens. ROA.146-149.

After Bullock's motion was submitted, the district court issued an order asking the parties "whether it should appoint a historian to serve as a consulting expert" in the case. ROA.163-168. Bullock responded that the court should not appoint a consulting expert because the government—not the court—bore the burden of establishing a historical tradition justifying Section 922(g)(1). ROA.180-188. The government responded that "the prohibition against felons possessing firearms is so thoroughly established as to not require detailed exploration of the historical record for the purpose of this case." ROA.189. The

government further contended that Bullock's challenge was foreclosed by statements in *Heller* that "'longstanding prohibitions on the possession of firearms by felons'" remain permissible, and by pre-*Bruen* Fifth Circuit precedent holding that "felons as a class are not among the law-abiding citizens protected by the Second Amendment." ROA.190-194. The government also argued that, because Bullock's disqualifying convictions were for violent felonies, he was not a "law-abiding, responsible" citizen to whom the Second Amendment extended. ROA.194-195 (quotation marks omitted). And the government argued that, in any event, the court should rely on the parties to provide historical support for their respective positions. ROA.196-197. The government represented that it stood "ready to submit" historical sources and "more detailed briefing as ordered by the Court." ROA.196.

After submitting its response to the court's order, the government submitted two additional supplemental filings: first, a short submission informing the district court that, at that time, no other court of appeals or district court had sustained a Second Amendment challenge to Section 922(g)(1), *see* ROA.203-206; and second, the government's supplemental brief in *United States v. Quiroz*, No. 22-50834 (5th Cir. April 10, 2023), which explained the government's position that *Bruen*'s historical inquiry is a legal one that does not require factfinding or experts, *see* ROA.207-230.

In response to the government's supplemental submissions, the district court ordered the government to answer two questions: (1) whether, in any of the cases cited in its first supplemental filing, any court had "appoint[ed] a historian to serve as a consulting expert"; and (2) whether "professional historians submit[ted] amicus briefs" in any of those cases, ROA.231-232. The government responded that the "answer to both of the Court's questions is 'no,'" ROA.233, but that the court should nevertheless reject Bullock's Second Amendment challenge given the overwhelming weight of post-*Bruen* authority upholding Section 922(g)(1), ROA.234-235.

## III.  Decision Below

The district court granted Bullock's motion to dismiss. ROA.239-315. The court concluded that *Bruen* "abrogated Fifth Circuit precedent," ROA.246, and that the government failed to demonstrate a historical tradition of firearms regulation that supports disarming Bullock under *Bruen*, ROA.239-243.

The district court acknowledged that, after *Bruen*, most courts had found Section 922(g)(1) constitutional. ROA.270. The court declined, however, to "fall in line" with those cases for various methodological and substantive reasons. ROA.249, 270-294. The district court first explained that it had "doubt about the process those cases used to determine the history of the felon-in-possession ban" because none of the cited decisions was aided by (a) a government-

submitted "expert report from a historian justifying felon disarmament," (b) "an amicus brief from a historian," or (c) an "independent expert to help sift through the historical record." ROA.240-241, 272-277. The district court also disagreed with other courts' reliance on *Heller*'s "repeated statements about 'law-abiding, responsible citizens'" and its assurances that "'nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" ROA.278 (quoting *Heller*, 554 U.S. at 626-27), characterizing these statements as "dicta" on which the government could not rely. ROA.278-280. The court rejected other courts' reasoning that felons are not among "the people" to whom the Second Amendment extends. ROA.283-286. And it disagreed with other courts' historical analyses under *Bruen*'s second step. ROA.286-294.

Returning to Bullock's case, the district court concluded that the government failed to "meet its burden" under *Bruen*. ROA.303. The court concluded it was not bound by pre-*Bruen* Fifth Circuit precedent upholding Section 922(g)(1) under the Second Amendment because *Bruen* "expressly abrogated" those decisions. ROA.303. The court again dismissed *Heller*'s assurances that felon-in-possession laws are presumptively lawful as dicta. ROA.303. And the court rejected the government's *Heller*-based arguments that

the Second Amendment extends only to law-abiding, responsible citizens, a
class that excludes convicted felons. ROA.304-305.

Finally, the district court declined to consider the government's
argument—made in its court-ordered supplemental briefing, *see* ROA.194-195—
that Section 922(g)(1) is constitutional as applied to Bullock because his
disqualifying convictions were for violent felonies. ROA.306-307. The court
explained that it was bound by the rules of party presentation and, because
Bullock did not respond to the government's argument, the court would not
exercise its discretion to consider arguments outside the scope of the court's
order. ROA.307-308. Even if it were to consider this argument, however, the
court said it would reject the argument because the government failed to meet
its burden: "Armed with . . . knowledge [that Bullock has a criminal history] . . .
the government put forth no effort to ground in history the present charges it
brought again[st] him." ROA.308.

## SUMMARY OF ARGUMENT

The district court erred by holding that Section 922(g)(1) is
unconstitutional as applied to Bullock. The Second Amendment protects "the
right of the people to keep and bear Arms." U.S. Const. amend. II. But that right
"is not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); it is
subject to restrictions that are "not inconsistent with the rights of Americans . . .

to individually keep and bear . . . arms as historically understood." *United States v. Darrington*, 351 F.3d 632, 633-34 (5th Cir. 2003) (quotation marks omitted). As this Court has held for nearly 20 years, Section 922(g)(1)'s prohibition on the possession of firearms by felons is "not considered [an] infringement[] on the historically understood right to bear arms protected by the Second Amendment." *Id*. at 634.

*Bruen* did not "expressly abrogate" this precedent. *Bruen* rejected means-end scrutiny and clarified that the Second Amendment's analytical framework is rooted in the Amendment's text and history. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022). But it did not overrule, let alone explicitly, this Court's precedents upholding Section 922(g)(1) under the historical understanding of the right to keep and bear arms endorsed in *Heller*. *See Darrington*, 351 F.3d at 634. The district court's contrary holding is inconsistent with this Court's post-*Bruen* decisions disclaiming any suggestion that *Bruen* renders Section 922(g)(1) unconstitutional. And it is contrary to the chorus of district court decisions applying this Court's binding pre-*Bruen* precedent to uphold Section 922(g)(1) under the Second Amendment.

Even if *Bruen* abrogated this Court's pre-existing precedent, Section 922(g)(1) is unquestionably constitutional as applied to Bullock. The Second Amendment's text, as historically understood, excludes those who are not "law-

abiding, responsible citizens," *Heller*, 554 U.S. at 635, a class of individuals that indisputably excludes convicted felons. And even assuming Bullock is entitled to the Second Amendment's protections, the Nation's historical tradition of firearm regulation justifies disarming him. At the time of the Founding, felony offenses could be severely punished by estate forfeiture or even death. The Founding generation also categorically disarmed groups considered too untrustworthy to possess firearms, such as loyalists. And the common law tradition of disarming those adjudged dangerous to the peace of the kingdom, which was adopted by the colonies and persisted after the Founding, confirm a long-standing and common understanding that dangerous and irresponsible people could be disarmed. That tradition is sufficient to sustain Section 922(g)(1)'s application to all felons, including Bullock.

At a minimum, there is a well-established historical tradition of disarming those, like Bullock, with an entrenched history of violence. There is a largely undisputed consensus among courts and scholars that, at the very least, there is a historical tradition for disarming demonstrably dangerous felons. Disarming Bullock fits comfortably within that historical tradition. Section 922(g)(1) is thus constitutional as applied to Bullock given the seriousness of his multiple prior convictions. The district court's contrary reasoning is incorrect and should be reversed.

# ARGUMENT

For more than 60 years, Congress has restricted the possession of firearms and ammunition by any person convicted of a felony offense. 18 U.S.C. § 922(g)(1). And for more than 20 years, this Court has sustained that exercise of federal legislative authority against Second Amendment challenges, affirming and reaffirming that Section 922(g)(1) comports not only with the Second Amendment as historically understood, but also with the Supreme Court's pronouncements about the scope of that right. The district court nevertheless discarded this Court's precedents to hold that Section 922(g)(1) is unconstitutional as applied to Bullock. This was error.

## I.    The district court erred by concluding that *Bruen* "expressly abrogated" this Court's pre-*Bruen* precedents upholding Section 922(g)(1) under the Second Amendment.

A district court must follow a "legally indistinguishable decision of this [C]ourt . . . unless overruled en banc or by the United States Supreme Court." *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992). And for a Supreme Court decision to change this Court's law, the decision "must be more than merely illuminating with respect to the case before the court and must unequivocally overrule prior precedent." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (brackets and quotation marks omitted). Notwithstanding this longstanding rule, the district court held that *Bruen*

"expressly abrogated" this Court's binding precedent upholding Section 922(g)(1) under the Second Amendment. ROA.303. But *Bruen* did no such thing. To the contrary, *Bruen* affirmed the historical reasoning underlying this Court's prior decisions and confirmed that those decisions were correct. The district court was thus bound to apply them. This Court should reverse the district court's contrary decision.[4]

    A.    <u>Before *Bruen*, this Court upheld Section 922(g)(1) under the Second Amendment.</u>

In *United States v. Emerson*, 270 F.3d 203, 264-65 (5th Cir. 2001), this Court held that the Second Amendment protects an individual right to keep and bear firearms, a view that the Supreme Court later confirmed in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Two years after *Emerson*, this Court held that Section 922(g)(1)'s prohibition on the possession of firearms by felons did not infringe

---

[4] This Court has held at least one preserved challenge to Section 922(g)(1) in abeyance pending the Supreme Court's decision in *United States v. Rahimi*, No. 22-915 (oral argument scheduled for November 7, 2023). *See United States v. Collette*, No. 22-51062. And the Court has at least three other similar appeals pending. *United States v. Charles*, No. 23-50131 (appellant's reply brief filed on October 10, 2023); *United States v. Grinage,* No. 23-50261 (appellant's reply brief filed on October 17, 2023); *United States v. Melendrez-Machado*, No. 23-50506 (government-appellee's brief filed on October 27, 2023). The government believes this Court can resolve the threshold question whether pre-*Bruen* circuit precedents remain binding without waiting for the Supreme Court's decision in *Rahimi*. The government nevertheless defers to the Court regarding whether to hold this case pending *Rahimi*.

on that individual right. *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003). The Court observed that the individual right protected by the amendment may be subject to restrictions that are consistent "with the right of Americans generally to individually keep and bear . . . arms as historically understood in this country." *Id.* at 633-34 (quotation marks omitted). Consistent with this principle, *Darrington* concluded that "legislative prohibitions on the ownership of firearms by felons are not considered infringements on the historically understood right to bear arms protected by the Second Amendment." *Id.* at 634; *see also United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) ("It is not inconsistent with the Second Amendment to limit the ability of convicted felons to keep and possess firearms."); *United States v. Mares*, 402 F.3d 511, 516 (5th Cir. 2005) (same).

Following *Darrington*, the Supreme Court held in *Heller* that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. 554 U.S. at 635. That decision clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. And it said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626-27 & n.26.

After *Heller*, this Court "reaffirm[ed] *Darrington* and the constitutionality of § 922(g)." *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009), *abrogated on other grounds*, *United States v. Kelley*, 40 F.4th 276, 286 (5th Cir. 2022). In reaffirming *Darrington*, this Court relied on the Supreme Court's assurances in *Heller* that it was casting no "doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 352 n.6 (quoting *Heller*, 554 U.S. at 626). And since then, this Court has repeatedly recognized that *Darrington* and *Everist* foreclose Second Amendment challenges to Section 922(g)(1). *See United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010).

B.    <u>*Bruen* did not "unequivocally" or "expressly" abrogate this Court's prior decisions.</u>

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022), the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen* struck down a New York law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home because the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156.

*Bruen* rejected the "two-step" framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125-26. *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 2127. But the Court "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] do not support applying means-end scrutiny in the Second Amendment context." *Id*. at 2126-27.

*Bruen* then "reiterate[d]" the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2129. It explained that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2129-30. And when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130.

*Bruen* did not "unequivocally overrule" this Court's precedents upholding Section 922(g)(1) under a historical analysis both before and after *Heller*. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th at 792 (quotation marks omitted). Rather, *Bruen* "reiterate[d]" *Heller*'s "standard," explained that its holding was "[i]n keeping with *Heller*," and said it was "apply[ing]" the "test that [the Court] set

forth in *Heller*." 142 S. Ct. at 2126, 2129, 2131. Indeed, *Bruen* endorsed pre-existing circuit precedents that were "broadly consistent with *Heller*['s]" historical focus. *Bruen*, 142 S. Ct. at 2127. It thus "merely illuminat[ed]" the appropriate way to conduct *Heller*'s history-based inquiry into the lawfulness of gun regulations. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th at 792 (quotation marks omitted).

And *Bruen* did not suggest that prohibitions on the possession of firearms by felons are unconstitutional. *Bruen* did not address felon-in-possession laws or other status-based gun restrictions at all, a point emphasized in opinions joined by six justices. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating *Heller*'s assurances that felons can be dispossessed of firearms); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on" *Heller*'s statements about felon-in-possession laws).

This Court's decisions upholding Section 922(g)(1) are consistent with *Bruen*'s text-and-history analysis. *Darrington* upheld Section 922(g)(1) based on the Second Amendment's "historically understood right to bear arms." 351 F.3d at 634. And this Court's subsequent cases "reaffirm[ed] *Darrington* and the

constitutionality of § 922(g)" based on the Supreme Court's assurances in *Heller* that it was casting no "'doubt on longstanding prohibitions on the possession of firearms by felons.'" *Anderson*, 559 F.3d at 352 & n.6 (quoting *Heller*, 554 U.S. at 626). Those decisions remain good law even after *Bruen*.

C. The district court erred by holding that *Bruen* "expressly abrogated" this Court's pre-*Bruen* precedent.

In erroneously concluding that *Bruen* "expressly abrogated" this circuit's pre-existing precedent, the district court cited *Bruen*'s express abrogation of *National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*"). ROA.303 (citing *Bruen*, 142 S. Ct. at 2126-27 & n.4). But *NRA*, which did not address Section 922(g)(1), employed the very means-end scrutiny that *Bruen* disavowed. *NRA*, 700 F.3d at 195-96. *Bruen*'s rejection of *NRA* and other cases employing means-end scrutiny did not affect, let alone "unequivocally overrule," this Court's pre-*Bruen* precedent upholding Section 922(g)(1) under the historical inquiry required by *Heller* and *Bruen*. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th at 792 (quotation marks omitted).

This Court's post-*Bruen* precedents confirm that *Bruen* did not "expressly abrogate" prior precedent. For example, in rejecting Second Amendment challenges to Section 922(g)(1) under the plain-error standard, this Court has repeatedly held that *Bruen* does not "dictate" the conclusion that Section

18

922(g)(1) is unconstitutional. *United States v. Garza*, No. 22-51021, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023) (per curiam) (unpublished); *see also United States v. Fulwiler*, No. 23-30152, 2023 WL 7118748, at *1 (5th Cir. Oct. 27, 2023) (per curiam) (unpublished) (observing that "[s]ince *Bruen*, [this Court has] not ruled on a facial or as-applied challenge to § 922(g)(1) in our circuit," and rejecting unpreserved challenge for "a lack of clear or obvious error"); *United States v. Racliff*, No. 22-10409, 2023 WL 5972049, at *1 (5th Cir. Sept. 14, 2023) (per curiam) (unpublished); *United States v. Smith*, No. 22-10795, 2023 WL 5814936, at *1 (5th Cir. Sept. 8, 2023) (per curiam) (unpublished); *United States v. Washington*, No. 22-10574, 2023 WL 5275013, at *1 (5th Cir. Aug. 16, 2023) (per curiam) (unpublished); *United States v. Johnson*, No. 22-20300, 2023 WL 3431238, at *1 (5th Cir. May 12, 2023) (per curiam) (unpublished); *United States v. Pickett*, No. 22-11006, 2023 WL 3193281, at *1 (5th Cir. May 2, 2023) (per curiam) (unpublished); *United States v. Roy*, No. 22-10677, 2023 WL 3073266, at *1 (5th Cir. April 25, 2023) (per curiam) (unpublished); *United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, at *1 (5th Cir. April 25, 2023) (per curiam) (unpublished).[5] And in *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir.), *cert.*

---

[5] Since *Bruen*, another court of appeals has held, on plenary review, that its pre-*Bruen* precedent upholding Section 922(g)(1) against Second Amendment challenges survived *Bruen*. *See Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023) (holding that although "*Bruen* created a new test for determining the

*granted*, 143 S. Ct. 2688 (2023), this Court said that "*Heller*'s reference to 'law-abiding, responsible' citizens" referred to "groups that have historically been stripped of their Second Amendment rights," such as felons. *See also id.* at 464 (Ho, J., concurring) (explaining that "the government can presumably disarm dangerous convicted felons, whether they're incarcerated or not, without violating the Second Amendment"). Although the Court was not directly addressing Section 922(g)(1), its discussion assumed that provision's validity even while striking down another provision of the same statute.

Further, multiple district courts in this Circuit have concluded that pre-*Bruen* precedent governed their consideration (and rejection) of post-*Bruen* Second Amendment challenges to Section 922(g)(1). *See, e.g.*, *United States v. Jackson*, --- F. Supp. 3d ---, 2023 WL 6881818, at *4 (N.D. Miss. Oct. 18, 2023) (considering itself "bound by the Fifth Circuit's treatment of Section 922(g)(1)" and declining to "ignore pre-*Bruen* Fifth Circuit precedent on the constitutionality of Section 922(g)(1) absent a Fifth Circuit or Supreme Court decision reaching the issue"); *see also United States v. Herrera*, No. 20-cr-692, 2023 WL 5917414 (S.D. Tex. Sept. 11, 2023); *United States v. Betancourt*, No. 21-cr-229, 2023 WL 5917415 (S.D. Tex. Sept. 11, 2023); *United States v. Esparza*, No.

---

scope of the Second Amendment," it did not "indisputably and pellucidly abrogate [the court's] prior precedential opinion" upholding Section 922(g)(1)).

21-cr-144, 2023 WL 5659051 (W.D. Tex. Aug. 31, 2023); *United States v. Locket*, No. 22-cr-72, 2023 WL 5153549 (W.D. Tex. Aug. 10, 2023); *United States v. Mosely*, No. 22-cr-620, 2023 WL 4765596 (S.D. Tex. July 26, 2023); *United States v. Jeffery*, No. 21-cr-437, 2023 WL 4629556 (W.D. Tex. July 19, 2023); *United States v. Robinson*, No. 21-cr-159, 2023 WL 4304762 (N.D. Tex. June 29, 2023); *United States v. Zelaya Hernandez*, --- F. Supp. 3d ---, 2023 WL 4161203 (N.D. Tex. June 23, 2023); *United States v. Melendrez-Machado*, --- F. Supp. 3d ---, 2023 WL 4003508 (W.D. Tex. June 14, 2023). No other decision in this circuit has struck down Section 922(g)(1) after *Bruen*.

Because this Court's prior precedent upholding Section 922(g)(1) remains the law of this circuit, the district court was bound to follow it. *See Campbell*, 979 F.2d at 1121 n.8. The court's contrary decision was error.

## II. Even if *Bruen* Abrogated Circuit Precedent, Section 922(g)(1) Comports with the Second Amendment.

As explained above, this Court's pre-*Bruen* precedents unequivocally hold that Section 922(g)(1) comports with the Second Amendment, and those decisions remain good law. But even if this Court were to consider the constitutionality of Section 922(g)(1) anew under *Bruen*, that statute remains constitutional, especially as applied to Bullock, whose violent and dangerous felonies unquestionably authorize the government to disarm him.

A.   The Second Amendment's text as historically understood makes plain that Section 922(g)(1) is constitutional as applied to Bullock, a convicted felon.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence." *Heller*, 554 U.S. at 592 (quotation marks omitted); *see also id.* at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The right to bear arms is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634-35. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses. Felons do not fall within "the people" protected by the Second Amendment, and "the right . . . to keep and bear Arms" is not "infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

Legislatures historically have had wide latitude to exclude felons from the political community because of their convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* 29, as well as from other, closely related "political rights"— including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998) (explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

It remains the case that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not only the right to bear arms, but also "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (first citing 28 U.S.C. § 1865(b)(5), which bars convicted felons from

serving on a federal jury; and then citing *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), which upheld state felon disenfranchisement); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office). Just as Congress and several states have required persons convicted of felonies to forfeit other rights belonging to members of the political community, Section 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment). While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," "*Heller* recognizes an exception for some Americans," including felons and the mentally ill, which are "historically grounded and sensible." *Id.* (quoting *Heller*, 554 U.S. at 626); *see also, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010).

Quite apart from the Second Amendment's textual limitation of the right to bear arms to "the people," the right has historically been understood to extend only to law-abiding citizens. The Second Amendment's scope excludes those

who did not to enjoy the preexisting right, whether or not they are part of "the people" as other provisions of the Constitution use that phrase. "[T]he history of the 'pre-existing right' of 'the people' to 'keep and bear arms,' codified in the Second Amendment, demonstrates that the Second Amendment right extended, and continues to extend, 'to some categories of individuals, but not others.'" *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022). Thus, "even individuals who are indisputably part of 'the people' . . . might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *Id*. at 1045-46.

*Heller* explained that the Second Amendment codified a "right of law-abiding, responsible citizens." 554 U.S. at 635. The Supreme Court identified a non-exhaustive list of "presumptively lawful regulatory measures," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id*. at 626-27 & n.26; *see also McDonald*, 561 U.S. at 786 (opinion of Alito, J.).

*Bruen* confirmed this reading of *Heller*. Echoing *Heller*, the Court explicitly and repeatedly described the Second Amendment right as belonging only to law-abiding citizens. *See, e.g.*, *Bruen*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-

defense"); *id.* at 2131 (quoting *Heller*'s statement that the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense"); *id.* at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *see also United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) (reading *Heller* as "conclud[ing] that [the Second Amendment] protects the 'law-abiding, responsible' citizen's possession of arms for the 'lawful purpose of self-defense'"). These repeated references indicate that laws restricting the gun rights of non-law-abiding citizens like convicted felons are consistent with the Second Amendment.

Two other aspects of *Bruen* confirm that a person's status as non-law-abiding resolves the threshold question whether the Second Amendment extends to them. First, *Bruen* itself addressed whether the petitioners in that case were law-abiding when addressing the Second Amendment's textual scope, not when addressing historical precursors supporting the challenged law. *See* 142 S. Ct. at 2134. The Court observed that the parties did not dispute "that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id.* (citing *Heller*, 554 U.S. at

580). The Court thus implied that the Second Amendment covered them *because* they were undisputedly law-abiding, responsible citizens.

Second, *Bruen* explained that its opinion should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 142 S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 2162 (Kavanaugh, J. concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). Those regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted). And many (if not all) states' standards disqualify felons or anyone prohibited by federal law from having a gun.[6] By

---

[6] *See, e.g.*, La. Rev. Stat. § 40:1379.3(C)(10) (applicant shall "[n]ot have been convicted of, have entered a plea of guilty or nolo contendere to, or . . . be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"); Miss. Code. Ann. § 45-9-101(d) (applicant shall not be "ineligible to possess a firearm by virtue of having been convicted of a felony in a court of this state, of any other state, or of the United States"); Tex. Gov't Code § 411.172(a)(3) (applicant shall not have "been convicted of a felony"); Ky. Rev. Stat. § 237.110(4)(a) (applicant shall not be "prohibited from the purchase, receipt, or possession of firearms, ammunition, or both pursuant to 18 U.S.C. 922(g), 18 U.S.C. 922(n), or applicable federal or state law").

indicating that those regimes remain broadly constitutional, the Court strongly implied that the Second Amendment's text excludes people, like felons, who are not law-abiding. Otherwise, the objective criteria of most shall-issue states disqualifying applicants for licenses—and thus preventing them from bearing arms—would be presumptively unlawful and could survive only through case-by-case, historical inquiries. The Court suggested no such thing.

B.    Our Nation has a long-standing tradition of firearm regulation.

Our Nation's historical tradition of firearm regulation supports disarming felons. *Bruen*, 142 S. Ct. at 2126. History is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the scope of the Second Amendment. *Id.* at 2133-34 (emphasis omitted).

*i. Felony Punishment Laws.* Felonies have long been considered "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98 (capitalization omitted).

28

Permanent disarmament imposes a relatively slight burden compared to the penalties felons historically faced.

Capital punishment and estate forfeiture were commonly authorized punishments in the American colonies and then the states. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)); *Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, piracy on the high seas, and forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700's authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes). These punishments often applied not only to violent crimes but also to crimes such as counterfeiting.[7]

---

[7] *See, e.g.*, 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 664-66 (1886) (1788 law establishing death penalty

The commission of a crime that was not serious enough to justify the death penalty could still result in the loss of the right to possess arms. In 1624, for example, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). In 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890). And during the American Revolution, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new

---

and estate forfeiture for crimes such as robbery and counterfeiting); 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302-03 (1821) (1777 law punishing forgery with estate forfeiture, whipping, and up to seven years' service on an armed vessel); Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767) (1743 law punishing forging or counterfeiting bills of credit with death and estate forfeiture); 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811) (1715 law punishing with estate forfeiture anyone convicted of corruptly "altering any will or record" in a way that resulted in injury to another's estate or inheritance).

Republic because they "were viewed as potential threats." *United States v. Daniels*, 77 F.4th 337, 351 (5th Cir. 2023).[8] The historical record thus indicates that legislatures could disarm—or even punish by death and estate forfeiture— those who were not law-abiding.

***ii. Historical Laws Disarming Those Deemed Dangerous.*** Historical laws also demonstrate "that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting); *see Binderup v. Att'y Gen.*, 836 F.3d 336, 368-69 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public."); *Folajtar v. Attorney General*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) ("English and early American laws disarmed the dangerous." (italics omitted));

---

[8] *See* 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 272 (2020) (observing that in "each [relevant] historical period," "violent or otherwise dangerous persons could be disarmed").

"[B]y the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Greenlee, 20 Wyo. L. Rev. at 261; *see id.* at 259-61 (detailing history). The American colonies inherited that tradition. Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 30 U.S. (5 Pet.) 233, 241 (1831)— empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[9] Some 17th- and 18th-century American statutes expressly recodified that rule.[10] Others made forfeiture part of

---

[9] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[10] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch.

the penalty for offenses such as unsafe storage of guns or gunpowder.[11] Although

those laws involved forfeiture of arms involved in an offense, rather than bans

on possessing arms, they show that legislatures could restrict an individual's

ability to bear arms if his conduct suggested that his possession of firearms would

endanger others.

Precursors to the Second Amendment proposed at the state ratifying

conventions also indicate that legislatures can disarm lawbreakers and those

who are dangerous. A proposed bill of rights presented at the Pennsylvania

ratifying convention stated that "no law shall be passed for disarming the people

or any of them unless for crimes committed, or real danger of public injury from

individuals." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665

(1971) (emphasis added). The Federalists defeated the proposal, but the Anti-

Federalists published it in the Dissent of the Minority of the Convention, *id.* at

---

21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[11] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674*, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

624, which was widely read and proved "highly influential" on the Bill of Rights. *Heller*, 554 U.S. at 604.

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001).

Post-ratification commentators and legislative enactments confirm this understanding of the Second Amendment. For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should

not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

In the 1840's, states began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes). These firearm-specific surety laws were not a 19th-century innovation but built upon a surety tradition that existed at common law, *see* 4 William Blackstone, *Commentaries on the Laws of England* 252 (1769), was codified by some colonies in the 1700s,[12] and was commonplace in the period immediately after the founding.[13]

---

[12] *See* Act About Binding to the Peace, ch, 26, 1700 Pa. Laws 5; Act About Binding to the Peace, ch. 4, 1700 Del. Laws 52; 1702 Conn. Acts 91; Act Declaring the Mode of Proceeding in Certain Criminal Cases, ch. 30, § 16, 1789 Va. Laws 17-18.

[13] *See State v. Davis*, 5 S.C.L. (3 Brev.) 3, 4 (S.C. Const. Ct. App. 1811); *Respublica v. Donagan*, 2 Yeates 437 (Pa. 1799); Tapping Reeve, *The Law of Baron*

As the 19th century wore on, guns became more lethal and more widely available. Guns in the 18th century generally fired only one shot, misfired, took a long time to load, and could not be kept loaded for long periods. Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). But technological developments in the 1800's—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—led to increased firearm use in homicides. *Id.* at 123-127. During this time, legislatures disarmed a range of individuals whom they deemed categorically unfit to carry firearms, including those below certain ages,[14] those

_____

*and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* 65-66 (New Haven, Oliver Steele 1816).

[14] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act

of unsound mind,[15] vagrants,[16] and intoxicated persons.[17]

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). And the Ohio Supreme Court explained that a law disarming "tramps" was

---

of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[15] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[16] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[17] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879).

consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

    C.    <u>The historical tradition of firearm regulation supports disarming all felons.</u>

Section 922(g)(1) is consistent with the historical tradition of imposing categorical limits on the right to keep and bear arms. By committing a felony offense, "a felon has shown manifest disregard for the rights of others," and his continued "possession of firearms would . . . threaten the security of his fellow citizens." *Everist*, 368 F.3d at 519. It's hard to dispute that "felons are more likely to commit violent crimes" than are law-abiding individuals. *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011). "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup*, 836 F.3d at 400 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments); *see id.* at 400 n.160 (collecting studies). And the Supreme Court has repeatedly recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983); *see, e.g., Lewis v. United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws . . . [focus on the] fact of conviction . . . in order to keep firearms away from potentially dangerous persons."); *Barrett v. United States*, 423 U.S. 212, 220 (1976) ("The history of

38

[Section 922(g)] reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

Section 922(g)(1) is also comparable to these precursors in "how and why" it "burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. Section 922(g)(1) does not burden "a law-abiding citizen's right" at all because it applies only to those who have committed felonies. *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). That aside, Section 922(g)(1) and its historical precursors "impose a comparable burden on the right of armed self-defense" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

Section 922(g)(1) and its historical precursors impose a "comparable burden" in that each prevents a person from possessing arms. Capital punishment and estate forfeiture laws did so indirectly, by either depriving felons of their lives or requiring them to forfeit all their possessions. Other laws targeted firearms directly. The burden imposed on felons' fights is less severe than, or comparable to, these historical felony-punishment and disarmament laws.

Section 922(g)(1) and its historical precursors are also "comparably justified." *Bruen*, 142 S. Ct. at 2133. History shows that legislatures' reasons for disarming felons could include a legislative judgment that the disarmed persons could not be counted upon to be responsible, law-abiding members of the polity, or who presented a danger to themselves and to society.

D.    Our historical tradition of firearm regulation unquestionably permits disarming demonstrably dangerous felons like Bullock.

At a minimum, the historical record establishes that Congress may disarm those felons whose underlying conduct demonstrates that they are dangerous to themselves or others. That tradition demonstrates that Section 922(g)(1) is constitutional as applied to Bullock.

There is widespread agreement among courts and commentators that disarming dangerous and irresponsible felons is consistent with the American tradition. Indeed, some judges and commentators have maintained (incorrectly in the government's view) that *only* dangerous felons may be disarmed. *See, e.g.*, *Kanter*, 919 F.3d at 451-64 (Barrett, J., dissenting); Greenlee, 20 Wyo. L. Rev. at 257-67, 285-86; *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) ("English and early American laws disarmed the dangerous." (italics omitted)); *see also Rahimi*, 61 F.4th at 464 (Ho, J., concurring).

Section 922(g)(1)'s application to Bullock, who has a documented history of violence, is consistent even with this narrow view of the Second Amendment. "[W]hether a government can forbid *violent* felons from possessing a firearm has not been meaningfully questioned by courts to date." *United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (unpublished); *see also Daniels*, 77 F.4th at 354. And crimes such as manslaughter and aggravated assault are clearly violent. *See Range v. Att'y Gen.*, 69 F.4th 96, 104

(3d Cir. 2023) (explaining that the Federal Firearms Act of 1938, a predecessor to Section 922(g)(1), disarmed those who had been convicted of violent crimes, including murder, manslaughter, and assault with a dangerous weapon, among other offenses), *petition for writ of cert. filed*, No. 23-374 (Oct. 5, 2023).

Statistical evidence demonstrates that those convicted of violent felonies—including manslaughter, aggravated assault, assaulting a police officer, and simple assault—are likely to commit violence again in the future. For example, a 2019 study by the U.S. Sentencing Commission found that violent offenders were rearrested at a higher rate and for more serious crimes than non-violent offenders. United States Sentencing Commission, *Recidivism Among Violent Federal Offenders* (Jan. 2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf. Of the offenders who recidivated, 28.4% of them had assault as their most serious new charge. *Id.* at 3. And a 2021 study found that 57% of homicide offenders and 82% of assault offenders were rearrested within ten years of their release from state prison. Bureau of Justice Statistics, *Recidivism of Prisoners Released in 24 States in 2008: A 10-Year Follow-Up Period (2008-2018)*, at 10 (Table 11), https://bjs.ojp.gov/BJS_PUB/rpr24s0810yfup0818/Web%20content/508%20compliant%20PDFs. Many of those arrests were for violent offenses. Of those originally arrested for homicide, 28.1% were

rearrested for a violent offense. *Id.* And of those arrested for assault, 52.8% were rearrested for a violent offense. *Id.* Thus, past convictions for violent felonies like manslaughter and assault are highly indicative of future dangerousness.

Bullock demonstrates this phenomenon. *See Dickerson*, 460 U.S. at 120 (observing that criminal convictions "provide a convenient, although somewhat inexact, way of identifying 'especially risky people'"). After serving his prison sentence for manslaughter and assault, Bullock reoffended in 2013 by attempting aggravated assault on a law enforcement officer. ROA.387, 391. And in 2018 he reportedly pointed a gun at his wife and threatened to "blow her brains out." ROA.334. Bullock is precisely the kind of dangerous person that Congress unquestionably intended to disarm. *See Barrett*, 423 U.S. at 218 (observing that the "very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous").

E.  The district court made a series of errors in finding Section 922(g)(1) unconstitutional as applied to Bullock.

In holding that Section 922(g)(1) is unconstitutional as applied to Bullock, the district court made several errors.

i. As a threshold matter, the district court erred by faulting the government for not providing "any example of how American history supports § 922(g)(1)." ROA.306. The government's position was (and remains) that the district court

was bound by this Court's preexisting precedent upholding Section 922(g)(1) under the Second Amendment. *See* ROA.190-194; *supra* pp. 12-21. The government therefore did not need to provide additional historical support under *Bruen*. In any event, the government provided the district court with "overwhelming authority" from other courts addressing (and affirming) Section 922(g)(1)'s constitutionality, often after employing a historical analysis. *See* ROA.203-206. And the government stood "ready to submit" historical sources and "more detailed briefing as ordered by the Court." ROA.196.

The district court's dissatisfaction with the government's briefing and arguments below does not preclude this Court from considering the government's argument on appeal that Section 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation. As a general matter, because the district court considered the arguments that the government is making on appeal, this Court may consider them. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (a federal appellate court may consider an issue that was "passed upon" by the district court).

Further, *Bruen* requires courts to conduct a legal inquiry into the text and history of the Second Amendment. *See* 142 S. Ct. at 2130 n.6. Put another way, "the historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the

lawmaking process,' such as 'the formulation of a legal principle or ruling by a judge or court'—rather than adjudicative facts, which 'are simply the facts of the particular case.'" *Teter v. Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023). This Court may thus rely on legal arguments that are raised for the first time on appeal. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). And "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties." *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991). Although a court is "not *obliged* to sift the historical materials" itself, *Bruen*, 142 S. Ct. at 2150 (emphasis added), it "retains the independent *power* to identify and apply the proper construction of governing law," *Kamen*, 500 U.S. at 99 (emphasis added); *see* Fed. R. Evid. 201 advisory committee's note ("In determining the content or applicability of a rule of domestic law, the judge . . . may make an independent search for persuasive data or rest content with what he has or what the parties present." (quotation marks omitted)).[18]

---

[18] For similar reasons, the district court's insistence that it could only resolve Bullock's *Bruen* argument with the assistance of retained or court-appointed historians was mistaken. *See* ROA.272-277. Because the *Bruen* inquiry is a legal one, the government need not retain historical experts to carry its

ii. On the merits, the district court erred at both steps of the *Bruen* inquiry. Regarding *Bruen*'s "textual" step, the district court held that "the plain text of the Second Amendment covers Mr. Bullock's conduct—possession of ordinary firearms in the home—and therefore presumptively protects him." ROA.302. But the district court's approach to *Bruen*'s textual step was way too narrow. The relevant question is whether the plain text, as informed by history, permits disarming Bullock. *See Bruen*, 142 S. Ct. at 2126. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting those who have demonstrated disregard for the rule of law through the commission of multiple felony offenses.

While acknowledging *Heller*'s repeated statements that the Second Amendment extends only to law-abiding citizens, the district court dismissed those statements as "hopelessly vague" "dicta" which it accorded no weight. ROA.304 (quoting *Range*, 69 F.4th at 102). Even assuming the statements are dicta, the district court was bound to apply them. Lower courts "are generally bound by Supreme Court dicta, especially when it is 'recent and detailed.'" *Hollis*

---

burden of persuasion. *See United States v. Yates*, No. 21-cr-116, 2023 WL 5016971, at *2 (D. Idaho Aug. 7, 2023) (unpublished). Illustrating this point, this Court has resolved multiple post-*Bruen* Second Amendment challenges without the assistance of historical experts. *See Rahimi*, 61 F.4th at 443; *Daniels*, 77 F.4th at 340.

*v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) (quoting *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013)). Indeed, the district court's treatment of *Heller*'s statements is inconsistent with this Court's treatment of those same assurances, which a panel of this Court suggested would exclude people with felony convictions*, see Rahimi*, 61 F.4th at 452, or at least dangerous felons, *id.* at 464 (Ho, J., concurring), from the Second Amendment's scope. In any event, whatever the outer limits of the scope of the Second Amendment right may be, it no doubt applies to people like Bullock with convictions for violent felonies.

Regarding *Bruen*'s historical analysis, the district court erred by, among other things, rejecting Founding-era precursors to the Second Amendment as too few under *Bruen. See* ROA.287-290 (citing *Rahimi*, 61 F.4th at 457). These Founding-era precursors are just a few of *many* historical sources that justify Section 922(g)(1). *See supra* 28-38. Combined, they establish a historical tradition sufficient to justify Section 922(g)(1).

The district court also rejected these precursors outright because their text differed from the language that became the Second Amendment. ROA.287-290. Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604; *see also Rahimi*, 61 F.4th at 457. The Second Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that

46

"different people of the founding period had vastly different conceptions" of its scope. *Heller*, 554 U.S. at 603-05. The Founding-era precursors to the Second Amendment reveal a common conception that the government may disarm lawless and dangerous people. To the extent the district court understood *Rahimi* to render these Founding-era precursors wholly insignificant in analyzing the constitutionality of Section 922(g)(1) under the Second Amendment, it was wrong. *See Rahimi*, 61 F.4th at 457 (acknowledging that Pennsylvania and Massachusetts proposals "somewhat illuminate the scope of the firearm right at the time of ratification").[19]

The district court also erred by rejecting capital punishment laws as insufficiently analogous to Section 922(g)(1). *See* ROA.290-291. It is true that historical laws condemning certain felons to death is not *identical* to the lifetime ban on firearm possession that Section 922(g)(1) imposes. *See* ROA.289-291. But *Bruen* does not require a "historical twin." 142 S. Ct. at 2133 (emphasis omitted). Capital punishment effectively worked as a lifetime ban on firearm possession for felons. It is thus "analogous enough to pass constitutional muster." *Id*.

*     *     *

---

[19] The government preserves the argument that *Rahimi* wrongly concluded that Founding-era precursors cannot serve as historical analogues under *Bruen*. 61 F.4th at 457.

The district court, critical of the governing text-and-history framework, applied a too-narrow reading of *Bruen* to find Section 922(g)(1) unconstitutional as applied to an unquestionably dangerous person. Under the district court's reading, Section 922(g)(1) is likely unconstitutional as applied to *everyone*, regardless of their propensity (or not) and ability (or not) to use firearms responsibly. That cannot be right. Contrary to the district court's conclusion, there is a well-documented historical tradition of disarming all felons, and at a minimum violent felons like Bullock. Section 922(g)(1) is constitutional as applied to him, and this Court should reverse the district court's judgment.

## CONCLUSION

This Court should reverse the district court's order dismissing the indictment against Bullock.

Respectfully submitted,

TODD W. GEE
United States Attorney

GAINES CLEVELAND
Appellate Chief

JENNIFER CASE
Deputy Appellate Chief
Southern District of Mississippi

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

November 3, 2023

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,493 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

/s/ Mahogane D. Reed
MAHOGANE D. REED