No. 23-60408

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA
Plaintiff-Appellant

v.

JESSIE BULLOCK
Defendant-Appellee

Appeal from the United States District Court
For the Southern District of Mississippi
Cause No. 3:18-cr-165-CWR-FKB-1

---

## BRIEF FOR APPELLEE

---

**Omodare B. Jupiter** (MS Bar #102054)
Federal Public Defender
N. and S. Districts of Mississippi
200 S. Lamar Street, Suite 200-N
Jackson, MS  39201
Telephone:  601-948-4284
Facsimile:   601-948-5510


**Michael L. Scott** (MS Bar #101320)
Senior Litigator

Attorney for Defendant-Appellee

## CERTIFICATE OF INTERESTED PARTIES

The undersigned certifies that the following persons have an interest in the outcome of this case:

1. Jessie Bullock, Defendant-Appellee;

2. Todd W. Gee, United States Attorney, Southern District of Mississippi, Jackson, Mississippi;

3. Nicole M. Argentieri, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C.;

4. Lisa H. Miller, Attorney, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C.;

5. Mahogane D. Reed, Attorney, Appellate Section, Criminal Division United States Department of Justice, Washington, D.C.;

6. Gaines Cleveland, Appellate Chief, United States Attorney, Southern District of Mississippi, Jackson, Mississippi;

7. Jennifer L. Case, Assistant United States Attorney, Southern District of Mississippi, Jackson, Mississippi;

8. Omodare B. Jupiter, Federal Public Defender, Northern and Southern Districts of Mississippi, Jackson, Mississippi;

9. Michael L. Scott, Senior Litigator, Office of the Federal Public Defender, Southern District of Mississippi, Jackson, Mississippi;

i

10.     Kimberly Golden Gore, Research and Writing Specialist, Office of the Federal Public Defender, Southern District of Mississippi, Jackson, Mississippi; and

11.     Honorable Carlton W. Reeves, United States District Judge, Jackson, Mississippi.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ *Michael L. Scott*
Senior Litigator

## STATEMENT REGARDING ORAL ARGUMENT

Because the Court has not yet addressed how *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) applies to a Second Amendment challenge to 18 U.S.C. § 922(g)(1) or to the procedural questions presented in this case, Mr. Bullock requests oral argument.

# TABLE OF CONTENTS

<u>page</u>:

CERTIFICATE OF INTERESTED PARTIES ........................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS................................................................................ iv

TABLE OF AUTHORITIES ................................................................... vii

I.  JURISDICTIONAL STATEMENT ..................................................................... 1

II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW .................................. 2

III.  STATEMENT OF THE CASE.................................................................... 3

    A.  Procedural history ....................................................................... 3

    B.  Statement of facts ....................................................................... 5

        1. Briefing on the motion to dismiss.............................................. 7

           a.  Mr. Bullock's motion to dismiss......................................... 7

           b.  The Government's response................................................ 8

           c.  Mr. Bullock's reply .......................................................... 10

        2. The district court's order...................................................... 11

           a. The district court's recitation of the *Bruen* test ..................... 11

           b.  Other courts' post-*Bruen* § 922(g)(1) decisions................................ 12

               i.  Procedural concerns........................................................ 12

                ii. Substantive concerns ..................................................... 13

c.   Applying *Bruen* to Mr. Bullock's case ...............................................16

IV.  SUMMARY OF ARGUMENT .......................................................................18

V.   ARGUMENT ...............................................................................................20

A.  Standard of review ..........................................................................20

B.  The *Bruen* test ...............................................................................20

C.  The Government failed to meet its burden of proof when it declined to
    provide historical analogues to the district court ..........................................23

    1.  The principle of party presentation limits the Government's
        arguments on appeal to those it raised below ..........................................25

    2.      The Government's arguments, as presented, do not satisfy the
            *Bruen* test ...................................................................................27

        a.      *Heller*'s *dicta* and pre-*Bruen* decisions from this Court
                do not satisfy the *Bruen* test ......................................................27

        b.      The Second Amendment is not limited to
                "law-abiding, responsible citizens," and Mr. Bullock is
                one of "the people" protected by the Second Amendment ......31

        c.      The Government has failed to meet its burden
                because its position is inconsistent with the *Bruen* test ..........36

D..The district court correctly held that § 922(g)(1) was unconstitutional
    as applied to Mr. Bullock because the Government's proffered
    analogues are not consistent with "this Nation's historic tradition of
    firearm regulation."...................................................................................37

    1.      There is no historical tradition of permanently disarming felons
            by requiring estate forfeiture or by imposing the ultimate
            deprivation of rights – loss of life by capital punishment.................37

    2.      The Government's dangerousness argument fails as applied to
            Mr. Bullock.......................................................................................41

VI. CONCLUSION...................................................................................42

CERTIFICATE OF SERVICE ...............................................................43

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................44

# TABLE OF AUTHORITIES

Cases                                                                page(s):

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ......................................................................... Passim

*Abramski v. United States,*
  573 U.S. 169 (2014) ................................................................................. 9

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ......................................................................... Passim

*Dobbs v. Jackson Women's Health Org.,*
  142 S. Ct. 2228 (2022) .......................................................................... 22

*Folajtar v. Attorney General,*
  980 F.3d 897 (3d Cir. 2020) .............................................................. 26, 34

*Greenlaw v. United States,*
  554 U.S. 237 (2008) .............................................................................. 23

*In re Bonvillian Marine Serv., Inc.,*
  19 F.4th 787 (5th Cir. 2021) ................................................................. 29

*Kamen v. Kemper Financial Services, Inc.,*
  500 U.S. 90 (1991) ................................................................................ 25

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ............................................................ Passim

*Lange v. California,*
  141 S. Ct. 2011 (2021) ...................................................................... 31, 39

*McDonald v. City of Chicago, Ill.,*
  561 U.S. 742 (2010) .......................................................................... 11, 31

*Nat'l Rifle Ass'n of Am.. Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  700 F.3d. 185 (5th Cir. 2012) ............................................................. 7, 20

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S.Ct. 2111 (2022) .................................................................. Passim

*Range v. Att'y Gen. United States of Am.*,
  69 F.4th 96 (3d Cir. 2023) .............................................................. Passim

*Tennessee v. Garner*,
  471 U.S. 1 (1985) ................................................................ 31, 33, 39

*United States v. Anderson*,
  559 F.3d 348 (5th Cir. 2009) ............................................................ 28, 31

*United States v. Daniels*,
  77 F.4th 337 (5th Cir. 2023) .................................................. 9, 30, 34, 41

*United States v. Darrington*,
  351 F.3d 632 (5th Cir. 2003) ................................................................ 28

*United States v. Emerson*,
  260 F.3d (5th Cir. 2001) ..................................................................... 27

*United States v. Everist*,
  368 F.3d 517 (5th Cir. 2004) ................................................................ 28

*United States v. Forbis*,
  No. 4:23-cr-133-GKF (N.D. Okla. Aug. 17, 2023) ........................................ 35, 39

*United States v. Jones*,
  565 U.S. 400 (2012) ...................................................................... 25, 26

*United States v. Mares*,
  402 F.3d 511 (5th Cir. 2005) ................................................................ 28

*United States v. Massey*,
  849 F.3d 262 (5th Cir. 2017) ................................................................ 28

*United States v. Miller*,
  307 U.S. 174 (1939) ................................................................. 11

*United States v. Mix*,
  791 F.3d 603 (5th Cir. 2015) ................................................... 25

*United States v. Percy-Macias*,
  335 F.3d 421 (5th Cir. 2005) ................................................... 20

*United States v. Piazza*,
  647 F.3d 559 (5th Cir. 2011) ................................................... 25

*United States v. Rahimi*,
  61 F.4th 443 (5th Cir. 2023) ............................................. Passim

*United States v. Samuels*,
  808 F.2d 1298 (8th Cir. 1987) ................................................. 23

*United States v. Scroggins*,
  599 F.3d 433 (5th Cir. 2010) ................................................... 28

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ................................................................. 33

*United States v. Washington*,
  2023 WL 5275013 (5th Cir. Aug. 16, 2023) ............................. 30

*Yee v. v. City of Escondido*,
  503 U.S. 519 (1992) ................................................................. 25

<u>Constitutional Provision and Statutes</u>

U.S. Const., amend. II ........................................................... 7, 20

18 U.S.C. § 922(g) ....................................................................... 8

18 U.S.C. § 922(g)(1) ......................................................... Passim

18 U.S.C. § 922(g)(3) ................................................................. 9

18 U.S.C. § 922(g)(4)...........................................................................8

18 U.S.C. §922(n) .................................................................................4

28 U.S.C. § 1291 ....................................................................................8

28 U.S.C. § 3731 ....................................................................................1

Rules

Fed. R. App. P. 4(b)(1)(A) ...................................................................1

Fed. R. App. P. 32(a)(5) ......................................................................44

Fed. R. App. P. 32(a)(6) ......................................................................44

Fed. R. App. P. 32(a)(7)(B) .................................................................44

Other Authorities

Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive* 193 .......................................................40

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1st ed. 1868) .... 32-33

Crimes Act of 1790, ch. 9, 1 Stat. 112 ............................................37, 38

Christina Mulligan et al., *Founding-Era Translations of the U.S. Constitution*, 31 Const. Comment 1...........................................................................38

Dale's Laws, https://tinyurl.com/daleslaws .................................................40

The Heritage Foundation, *Count the Code: Quantifying Federalization of Criminal Statutes,* https://tinyurl.com/felonycount...............................................39

Oral Argument, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023) .................. 32

United States Sentencing Commission, History of Mandatory Minimum Penalties and Statutory Relief Mechanisms, https://tinyurl.com/1790USSC ................................................................................ 38

# I. JURISDICTIONAL STATEMENT

This appeal arises from a final order of the district court dismissing the superseding indictment against Mr. Bullock. Order, ROA.239. The superseding indictment charged Mr. Bullock with one count of violating 18 U.S.C. § 922(g)(1), which makes it a crime for a person previously convicted of a felony offense to knowingly possessing a firearm. Superseding Indictment, ROA.408. The Government filed a timely Notice of Appeal pursuant to Rule 4(b)(1)(A) of the Federal Rules of Appellate Procedure. Notice of Appeal, ROA.316. Jurisdiction is vested in this Court under 28 U.S.C. § 3731.

## II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)     Whether, under the principle of party presentation, the district court correctly held that the Government failed to meet its burden of proof under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022); and

(2)     Whether the district court correctly held that 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to Mr. Bullock.

## III.  STATEMENT OF THE CASE

### A.     Procedural history

In August 2018, a grand jury indicted Mr. Bullock on one count of violating 18 U.S.C. §922(g)(1). Indictment, ROA.321. In October 2019, the grand jury issued a superseding indictment, charging Mr. Bullock with the same violation.[1] Sup. Indictment, ROA.324. Mr. Bullock was arraigned in late March 2020, approximately eighteen months after he was indicted. Minute Entry, ROA.4 (dated March 27, 2020). Following a detention hearing, Mr. Bullock was released on bond. Det. Hrg., ROA.327-83; Appearance Bond, ROA.47-49; Order on Release, ROA.50-53.

The trial was continued multiple times due to COVID-related delays. Motions to Continue, ROA.64-66, 69-71, 74-76, 81-83, 86-88, 91-93, 98-100, 112-14, 122-24; Orders on Motions to Continue, ROA.67-68, 72-73, 77-78, 84-85, 89-90, 94-95, 96-97, 101-02, 115-16, 125-26, 131-32.

In the meantime, the Supreme Court issued the *Bruen* decision in June 2022. *Bruen*, 142 S.Ct. at 2111. Mr. Bullock filed a motion to dismiss pursuant to *Bruen* in August 2022. Motion to Dismiss, ROA.133. After receiving all briefing on the motion to dismiss, the district court issued an order requesting the parties' input on

---

[1] The sole difference between the indictment and the superseding indictment is the addition of language in the superseding indictment that Mr. Bullock knew he had a prior felony conviction at the time he allegedly possessed a firearm. Indictment, ROA.321; Sup. Indictment, ROA.324.

retaining a consulting historian to assist the court in reviewing the relevant history. Historian Order, ROA.163-68. Mr. Bullock objected to the appointment of a consulting historian on the grounds that it would shift the burden of proof away from the Government and that the Government had failed to meet its burden to present historical analogues to support the constitutionality of 18 U.S.C. § 922(g)(1). Bullock Historian Response, ROA.180-88. The Government also objected to the appointment of an historian because "[w]hile determining the historical basis for gun regulations is no doubt important generally, the prohibition against felons possessing firearms is so thoroughly established as to not require detailed exploration of the historical record for the purpose of this case." Gov. Historian Reply, ROA.189.

The Government subsequently filed two unsolicited supplemental submissions. The first submission string-cited approximately 120 cases addressing §922(g)(1) post-*Bruen*. First Submission, ROA.203-06. The second submission was a letter to the district court attaching a brief that the Government submitted to the Fifth Circuit in *United States v. Quiroz*, No. 22-50834, an appeal involving 18 U.S.C. §922(n). Second Submission, ROA.207-30. The Government's letter doubled down on its opposition to the appointment of a consulting historian on the grounds that applying *Bruen* is a purely legal question. Second Submission, ROA.207.

The Government's unsolicited submissions prompted the district court to enter an order asking the government to address whether any of the 120 or so cases

string-cited in the first submission involved the appointment of a historian or the submission of any *amicus* briefs from historians. Supp. Historian Order, ROA.231-32. The Government responded no, again asserting that historians were not necessary to the resolution of §922(g)(1) cases. Gov. Supp. Response, ROA.233-35. Mr. Bullock replied with a status report on the as-then incomplete briefing in the *Quiroz* case, noting that the Fifth Circuit had raised, but not resolved, a similar question.[2] Bullock Supp. Reply, ROA.235-37.

The district court entered its order granting Mr. Bullock's motion to dismiss on June 28, 2023. Order of Dismissal, ROA.239-315. The Government appealed. Notice of Appeal, ROA.316.

## B.    Statement of facts

This appeal is unusual insofar as it involves an order dismissing an indictment solely on the briefing submitted by the parties. As such, the issues before this Court are purely legal questions.

The Government, however, spends a portion of its brief discussing allegations surrounding the events in May 2018 that led to the superseding indictment, in an attempt to paint Mr. Bullock as dangerous. Mr. Bullock was not indicted in the district court with any crimes related to that alleged conduct. When the Government

---

[2] As of December 1, 2023, *Quiroz* is still pending in this Court.

presented testimony on those allegations to establish dangerousness during the

detention hearing in April 2020, the magistrate judge observed the following:

> a grand jury from this court indicted him almost two years ago, and
> apparently nobody thought that he posed such a risk that they needed
> to go arrest him and bring him before the Court. He was indicted August
> the 21[st], 2018.
>
> It would be downright silly for the Court at this point to say, despite all
> of that, that he poses a danger to his wife, contrary to her own sworn
> testimony[3], contrary to the time that he's been out on bond from this
> very incident[4], and no one feeling that he poses such a danger that they
> needed to go pick him up as early as August of 2018 when he was first
> indicted.

Det. Hrg., ROA.371-72. The magistrate judge further held that Mr. Bullock's first

conviction, having occurred 26 years earlier, was essentially "a bar fight" and was

of "limited present probative value as to whether he poses a danger to others or the

community." Det. Hrg., ROA.370. His other prior convictions, despite their

descriptors, "do[] not appear to have been very serious because he was just put on

probation, and he served no time for that." For those reasons, the magistrate court

determined that the Government had not presented "clear and convincing evidence

---

[3] The magistrate judge did find some portions of Mrs. Bullock's testimony "odd,"
"unreliable and not credible," but he also stated that Mrs. Bullock "testified under
oath that she does not believe that he poses a risk of danger to her." Det. Hrg.,
ROA.371.

[4] At the time of the detention hearing, Mr. Bullock did have state charges pending
that stemmed from the events of May 2018, but he had been out on a $2,500 bond
for almost two years without incident. Det. Hrg., ROA.371.

that [Mr. Bullock] poses a danger to others or [the] community." Det. Hrg. ROA.372-73. Mr. Bullock was released on bond and remained on bond without incident until the district court dismissed the indictment.

The relevant facts, then, are as follows:

## 1.    Briefing on the motion to dismiss

### a.    Mr. Bullock's motion to dismiss

Mr. Bullock's motion to dismiss is grounded in the Supreme Court's *Bruen* decision. Motion to Dismiss, ROA.133-43. Mr. Bullock argued that his conduct – possession of a firearm – was presumptively protected by the Second Amendment. Motion to Dismiss, ROA.135-36. Mr. Bullock further argued that the Government

could not meet its burden to establish that § 922(g)(1) was "consistent with the Nation's historical tradition of firearm regulation." Motion to Dismiss, ROA.136-38.

In support, Mr. Bullock referenced this Court's observation that § 922(g)(1) "bears little resemblance to laws in effect at the time the Second amendment was ratified." Motion to Dismiss, ROA.136-37 (quoting *Nat'l Rifle Ass'n of Am.. Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d. 185, 196 (5th Cir. 2012) (abrogated by *Bruen*, 142 S.Ct. at 2125-27, n. 4). Mr. Bullock also referenced other sources, including the Government's own pre-*Bruen* statements in which it

acknowledged that § 922(g)(1) is a 20th century statutory creation not rooted in the Founding. Motion to Dismiss, ROA.138 (citations omitted).

Mr. Bullock contended that *Bruen*'s test prevailed over the Supreme Court's *dicta* in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and the Fifth Circuit's own pre-*Bruen* decisions, which relied on means-end scrutiny. Motion to Dismiss, ROA.139-42. Under *Bruen*'s test, then, Mr. Bullock's indictment under § 922(g)(1) violated the Second Amendment.

### b.     The Government's response

The Government's response did not attempt to apply the *Bruen* test. Gov. Resp., ROA. 146-50. Instead, the Government argued that *Bruen* did not abrogate the Fifth Circuit's earlier decisions upholding § 922(g)(1) for two reasons: First, the Government argued that this Court's pre-*Bruen* (and pre-*Heller*) precedent still applied because *Heller* included *dicta* about the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." Gov. Resp., ROA.146-47 (quoting *Heller*, 554 U.S. at 626). Second, the Government argued that the *Bruen* decision was limited to permitting laws and did not implicate 18 U.S.C. § 922(g), which prohibits certain classes of people from possessing firearms. Gov. Resp., ROA.147-48. Additionally, the Government claimed that *Bruen* limited the Second Amendment to "law-abiding, responsible citizens" and that the concurring opinions

in *Bruen* reinforced the constitutionality of § 922(g)(1). Gov. Resp., ROA.147-48 (quoting *Bruen*, 142 S.Ct. at n. 9).

The Government then suggested that the district court should dispose of Mr. Bullock's motion in the same manner as the district judge in *United States v. Daniels*, No. 1:22-cr-58-LG-RHWR-1 (Dkt. 29), who upheld the constitutionality of 18 U.S.C. § 922(g)(3). Gov. Resp., ROA.148. Notably, this Court reversed that decision in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *petition for certiorari filed*, No. 23-376 (Oct. 10, 2023).

The Government's only allusion to *Bruen*'s historical analogue test was the following statement: "the federal law that Defendant is charged with violating is part of the historical tradition of regulating firearms possession 'to prevent guns from falling into the wrong hands.'" Gov. Resp., ROA.148 (quoting *Abramski v. United States*, 573 U.S. 169, 172 (2014), which states in its entirety that "[f]ederal law has for over 40 years regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands."). *Abramski* was not a Second Amendment challenge, and its *dicta* contradicts the Government's claim that § 922(g)(1) is part of a historical tradition. Instead, it bolsters Mr. Bullock's position that § 922(g)(1) is a 20th century statutory creation, far removed from regulations in existence at the time of the Founding.

### c.    Mr. Bullock's reply

Mr. Bullock's reply rebutted the Government's misreading of *Bruen*. Reply Br., ROA.151-62. Mr. Bullock pointed out that the Government "avoids any acknowledgment of *Bruen*'s holding" and explained why the Government's reliance on *Heller*'s *dicta* failed. Reply Br., ROA.152-53.

First, Mr. Bullock argued that the Supreme Court expressly established *Bruen* as the test to be applied to *all* Second Amendment challenges, not just challenges to permitting schemes. Reply Br., ROA.152, 155. *Bruen* also rejected the means-end scrutiny test that courts of appeals coalesced around after *Heller*. Reply Br., ROA.155.

Second, *Heller* itself rejected reliance on dictum, stating that "It is inconceivable that [the Court] would rest [its] interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." Reply Br., ROA.155 (quoting *Heller*, 554 U.S. at 625, n. 25).

Third, the Government's reliance on the concurrences in *Bruen* was misplaced. Reply Br., ROA.154. By asking the district court to bypass the *Bruen* test and rely instead on *Heller*'s *dicta*, the Government ignored the fact that Bruen "employs and elaborates on the text, history, and tradition test that *Heller* and

*McDonald*[5] require." Reply Br., ROA.154 (quoting *Bruen* 142 S.Ct. at 2161 (Kavanaugh, J., concurring).

Finally, Mr. Bullock rebutted the Government's reliance on this Court's pre-*Bruen* precedent. Reply Br., ROA.157-58.

## 2.    The district court's order

The district court entered its order on June 28, 2023. Order, ROA.239-315. The district court approached the *Bruen* test in two ways: (1) it conducted an analysis of the *Bruen* test utilizing the reasoning of other post-*Bruen* district court cases addressing § 922(g)(1); and (2) it conducted an analysis of the *Bruen* test based strictly on the principle of party presentation. Order, ROA.239-315. The district court also opined on the pitfalls of relying on historical tradition specifically and originalism more generally. Order, ROA.247-50, 309-15 Those ruminations, however, are separate from the district court's application of *Bruen* and are not relevant to the appeal.

### a.    The district court's recitation of the *Bruen* test

The district court first established the Supreme Court's parameters of the Second Amendment and the test to be applied, starting with *United States v. Miller*, 307 U.S. 174 (1939) and continuing through *Bruen*. Order, ROA.252-60. The district court also discussed then-Judge Barrett's now famous dissent in *Kanter v. Barr*, 919 F.3d

---

[5] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010).

437, 451 (7th Cir. 2019) (Barrett, J. dissenting). The district court determined that *Bruen*'s "historical tradition" test abrogated this Court's pre-*Bruen* precedent.[6] Order, ROA.246, 303.

### b.    Other courts' post-*Bruen* § 922(g)(1) decisions

The district court then looked to post-*Bruen* § 922(g)(1) decisions from other district courts and the single circuit court of appeals decision – *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (*en banc*). Order, ROA.270-71, 279. The district court found that its counterparts across the country fell into two camps: (1) those who excluded felons from "the people" at step one of the *Bruen* test (the Government's argument below); and (2) those who found that felon-in-possession laws were sufficiently rooted in the Nation's historic tradition of firearm regulation. Order, ROA.270-71.

### i.    Procedural concerns

The district court then raised procedural and substantive concerns with these approaches. Procedurally, the district court was concerned with the lack of assistance on the question of building and analyzing a complete and accurate historical record without assistance from historians.. Order, ROA.272-77. The district court noted that historians could either provide expert testimony or amicus briefing. Order,

---

[6] The district court's holding that *Bruen* abrogated this Court's pre-*Bruen* precedent is consistent with this Court's decision in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023).

ROA.272-77. Without such assistance, the district court questioned the wisdom of inverting "the pyramid" of creating a factual record in the lower courts and instead having the lower courts render constitutional determinations without the benefit of any assistance from *amici* that the appellate courts might receive. Order, ROA.277.

### ii.    Substantive concerns

Substantively, the district court raised three concerns: (1) other district courts' reliance on dicta in *Heller* and *Bruen* to exclude felons from "the people" at step one of the *Bruen* test; (2) "counting the votes" at the Supreme Court and concluding that a majority of the Justices would uphold § 922(g)(1) as constitutional; and (3) assumptions and mistakes that other district courts make in evaluating the *Bruen* test. Order, ROA.278-96. In evaluating the last area of concern, the district court made several holdings that are relevant on appeal.

First, the district court agreed with the Third Circuit's holding in *Range* that felons are not excluded from "the people" and are, therefore, presumptively hold Second Amendment rights. Order, ROA.283-85. The district court reasoned that *Bruen*'s step one focuses on conduct, not status: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126l Order, ROA.283-84. This conclusion was buttressed by *Heller*'s holding (not its *dicta*) that "the people," as that term is used in the First, Second, and Fourth Amendments to the Constitution "refers to a class

of persons who are part of a national community" – not a "subset." *Heller*, 554 U.S. at 580-81; Order, ROA.284. *Heller* "start[s] therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581; Order, ROA.284. The district court further agreed with *Range* that "the people" must be interpreted broadly because limiting the Second Amendment to *Heller*'s *dicta* regarding "law-abiding, responsible citizens" "renders the category hopelessly vague." *Range*, 69 F.4th at 102; Order, ROA.284-85.

Second, those lower courts who addressed step two of the *Bruen* test typically considered three avenues of historical analysis, all of which were fraught with error. Order, ROA.287-94. The first sources were the ratifying conventions of Massachusetts, Pennsylvania, and New Hampshire, which all engaged in a debate over the wording of the Second Amendment. Order, ROA.287. Each of the conventions proposed amendments included limiting language on the right to bear arms. Order, ROA.287. As the district court notes, however, "none of those proposals became law," and originalism does not divulge why those limitations were not included in the final text of the Second Amendment. Order, ROA.287-88. The district court then explains that "*Bruen* expressly instructs judges to 'doubt that *three* colonial regulations could suffice to show a tradition of gun regulation. *Bruen*, 142 S.Ct. at 2142, 2153; Order, ROA.289 (emphasis added in order). The district court

also points out that then-Judge Barrett's *Kanter* dissent notes that the concerns expressed in the proposed limiting language – to "peaceable citizens," to all "unless for [unidentified] crimes committed," and to those "in actual rebellion" – were not focused on felons or even criminals in general. *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting); Order, ROA.289.

The second area of historical analysis involved the death penalty. The Government often argued that capital punishment and estate forfeiture for felons at the time of the Founding necessarily included deprivation of the right to bear arms or, alternatively, was a lenient (and constitutionally permissible) punishment. Order, ROA.289-90. The district court opined that a review of those historical sources does not reveal whether "persons with felony convictions can be disarmed because some were executed" or whether "disarmament applies only to persons convicted of a death-eligible offense." Order, ROA.290. Moreover, the Third Circuit, in *Range*, found that the historical record allowed felons to "repurchase arms" after serving their debt to society. *Range*, 69 F.4th at 105; Order, ROA.290-91.

Third, courts often turned to law review articles on the Second Amendment. Order, ROA.291-94. The district court reviewed the top five most-cited articles. Order, ROA.291-94. After setting aside the obvious issues with credibility and peer review, the district court noted that these articles can be "cherry-picked" to reach opposing conclusion and do not rely on a significant number of Founding-era

sources. Order, ROA.291-94. As such, there are no standards for evaluating the credibility or admissibility of such articles. Order, ROA.295.

Before turning to Mr. Bullock's case, the district court also addressed his concerns with adjudicating *Bruen* cases categorically versus individually. He noted that a categorical determination associated with a "high level" finding that felons can be disarmed raises a series of additional questions with no clear answers:

(1) What was the original meaning of a felony?

(2) Are all modern felonies included, or just those that existed at the Founding?

(3) Are all felonies created equal, or do just violent felonies result in disarmament? Order, ROA.29-302.

### c.    Applying *Bruen* to Mr. Bullock's case

The district court recited the Government's arguments, addressed *supra* at 8-9. Order, ROA.303-04. The district court evaluated those arguments against the conclusions it had drawn from its review of *Bruen* and post-*Bruen* § 922(g)(1) cases. Order, ROA.304-05. The district court concluded that the Government had failed to meet its burden, holding as follows: "Missing from this brief, in sum, is any example of how American history supports § 922(g)(1), much less the number of examples Bruen requires to constitute a well-established tradition." Order, ROA.306.

The district court declined to accept the Government's supplemental briefs, which raised new arguments "contending that Mr. Bullock qualifies for disarmament

because his felonies were violent and he is dangerous." Order, ROA.306, citing Historian Resp., ROA.194-95. Citing the principle of party presentation clearly stated in *Bruen*, the district court declined to consider the new arguments raised in the supplemental briefing, finding them to be "untimely" and "an unauthorized second bite at the apple." Order, ROA.307-08. Alternatively, the district court held that it would have rejected those arguments on the merits. Order, ROA.308-09.

The district court then dismissed the indictment, narrowly holding that, on the record before it, § 922(g)(1) was unconstitutional as applied to Mr. Bullock. Order, ROA.309. The district court made clear that the Government could "continue to prosecute other persons for violating § 922(g)(1)." Order, ROA.309.

## IV. SUMMARY OF ARGUMENT

The Government wholly failed to meet its burden of proof in this as-applied challenge to the Second Amendment. This is not a case in which the Government's historic analogues failed to establish that 18 U.S.C. § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" under either the distinctly relevant or similarly relevant standards set forth in *Bruen*. 142 S.Ct. at 2129-30. Rather, this is a case in which the Government staked its entire case on the position that § 922(g)(1) falls outside the *Bruen* test and requires no analysis of historic analogues. The Government had two opportunities to present historic analogues to the district court, and it declined to do so.

The district court applied the principle of party presentation and concluded that the Government had not met its burden. Order, ROA.307-08. This Court should also apply the principles of party presentation and judicial restraint and hold that the Government failed to meet its burden *as applied* to Mr. Bullock.

Even if this Court chooses to accept the Government's belated presentation of historic analogues and conduct a substantive review of the district court's order under *Bruen*, the Government still failed to establish that 18 U.S.C. § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" as applied to Mr. Bullock. In its analysis of other post-*Bruen* district court decisions on § 922(g)(1), the district court properly evaluated the Government's two proffered

historic analogues: (1) capital punishment for felonies as including the lesser restriction of disarmament; and (2) dangerousness as a metric for disarmament. In both instances, the district court properly found that other district courts' analysis of those analogues failed to meet the standard of review set forth in *Bruen*. The Government's arguments, set forth in detail for the first time in its appellate briefing, bring nothing new to the discussion of these analogues. For that reason, this Court should find that the Government has failed to establish that § 922(g)(1) is constitutional *as applied* to Mr. Bullock.

# V. ARGUMENT

## A.    Standard of review.

This Court reviews all constitutional questions and all issues of statutory interpretation *de novo*. *United States v. Percy-Macias*, 335 F.3d 421, 425 (5th Cir. 2005).

## B.    The *Bruen* test

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const., amend. II. The Supreme Court has held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

The Supreme Court's recent decision in *Bruen* set out "the standard for applying the Second Amendment":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2129–30. In so holding, the Supreme Court rejected lower courts' use of means-end scrutiny in Second Amendment cases. *See id.* at 2125–27 & n.4 (abrogating *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012)). "To justify its regulation, the government may not simply posit that the regulation promotes an important interest.

Rather, the government must demonstrate that the regulation is consistent with this "Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2126. In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

*Bruen* provides that when a court is required to analyze the "Nation's historic tradition of firearm regulation," two standards apply. *Bruen*, 142 S.Ct. at 2130-31. In some cases, the historical inquiry is "fairly straightforward." *Id.* at 2131. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131 (emphasis added). Where a challenged regulation addresses "unprecedented societal concerns or dramatic technological changes," courts need only find a "relevantly similar" regulation to justify a restriction on Second Amendment rights. *Id.* at 2132. In evaluating whether a historical regulation is distinctly or relevantly similar to the modern regulation being challenged, courts should look to "two metrics," addressed in *Heller* and *McDonald*: "*how* and *why* the regulations burden" Second Amendment rights. *Bruen*, 142 S.Ct. at 2132-33 (emphasis added). Additionally, "whether modern and historical regulations impose a comparable burden on the right of armed

self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Bruen*, 142 S.Ct. at 2133 (internal punctuation and citations omitted) (emphasis in original).

The historical tradition test, then, requires more than a broad declaration that relies on generalities. The Supreme Court, in *Bruen*, engaged in a detailed analysis of statutes and regulations, giving priority to those in existence at the time the Second Amendment was ratified. *See id.* at 2136. The Court did so because, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35. Accordingly, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Historical evidence from the late nineteenth century and the twentieth century "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28; *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022) (stating that "how the States regulated" when a constitutional Amendment was ratified is "the most important historical fact").

22

**C.    The Government failed to meet its burden of proof when it declined to provide historical analogues to the district court.**

**1.    The principle of party presentation limits the Government's arguments on appeal to those it raised below.**

This Court should deny the Government's appeal under the principle of party presentation. The principle of party presentation requires courts to "rely on the parties to frame the issues for decision and assign[s] to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). The principle should govern a court's conduct because "[c]ounsel almost always know a great deal more about their cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us." *Id.* at 244 (quoting *United States v. Samuels,* 808 F.2d 1298, 1301 (8th Cir. 1987) (parenthetical and internal quotation marks omitted).

In its response to Mr. Bullock's motion to dismiss, the Government took the position that it was not required to present *any* historical analogues to establish a historical tradition of completely and permanently disarming those convicted of a felony offense. Instead, the Government argued that the district court could rely on *dicta* in *Heller* and pre-*Bruen* cases from this Court to find § 922(g)(1) constitutional. Gov. Resp., ROA.146-48. The Government was so confident in its

23

position that it characterized Mr. Bullock's motion as "at best, wholly without merit, and at worst, frivolous." Gov. Resp., ROA.148.

The district court offered the Government an opportunity to amend its position in the order asking for the parties' input on whether the district court should appoint a consulting historian. Historian Order, ROA.163-68. In that order, the district court clearly articulated its understanding of the *Bruen* decision and its obligation to conduct an in-depth analysis of this Nation's historical tradition of disarming felons. Historian Order at 164-65.

The Government persisted in its position, even in the face of the district court's order. The Government stated that "[w]hile determining the historical basis for gun regulations is no doubt important generally, the prohibition against felons possessing firearms is so thoroughly established as to not require detailed exploration of the historical record for the purpose of this case." Gov. Historian Reply, ROA.189-97. The Government stated that it could provide additional briefing if the district court requested it. Historian Reply, ROA.196

Then, in March 2023, more than three months before the district court entered its decision, this Court issued its opinion in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023). *Rahimi* undercut the Government's position on every point it made to the district court, but the Government did not seek permission to file additional briefing addressing the impact of *Rahimi* on Mr. Bullock's case.

24

The Government now contends that it should be permitted on appeal to present the historical analogues that it did not present in the court below. Gov. Br. at 44. Specifically, the Government seeks to argue that historical felony capital punishment/forfeiture laws and laws disarming the "dangerous" both meet *Bruen*'s historic tradition test. Gov. Br. at 28-39. The cases that the Government cites in support of its ability to present new argument on appeal are inapposite. The Government cites cases that stand for the proposition that a federal *claim*, once raised by a party in the district court, is also properly before a reviewing court and can be decided on theories and arguments not raised in the court below. *See Yee v. v. City of Escondido*, 503 U.S. 519, 534 (1992); *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991). The Government, however, was not the petitioner below and has raised no claims of its own. Therefore, it cannot assert new legal theories on appeal. Rather, the Government is required to posit its legal theories in the district court or forfeit that theory of the case. *See, e.g., United States v. Jones*, 565 U.S. 400, 413 (2012); *United States v. Mix*, 791 F.3d 603, 612 (5th Cir. 2015); *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011).

In *Jones*, a defendant was convicted and appealed on the grounds that he had been subjected to an unconstitutional search. *Jones*, 565 U.S. at 403-04. On appeal, the government argued that there was no search because the defendant was not entitled to a reasonable expectation of privacy, but the court of appeals disagreed

and reversed the conviction. *See id.* at 404. The Supreme Court granted certiorari, and for the first time, the government argued, in the alternative, that it had reasonable suspicion to conduct the search. *See id.* at 413. The Supreme Court held that the government had forfeited the argument because it failed to raise the reasonable suspicion argument below. *See id.*

To the extent the Government presented any historical analogues, and Mr. Bullock does not concede that it did, the Government did not raise it until the district court ordered supplemental briefing on the historian question. Gov. Historian Reply, ROA.194-95. And even then, the Government's theory was limited to a factual argument, made in the alternative, that Mr. Bullock was violent and dangerous. In support, the Government cited two pre-*Bruen* decisions: *Kanter v. Barr*, 919 F.3d at 454 (Barrett, J., dissenting); and *Folajtar v. Attorney General*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting). Gov. Historian Reply, ROA.195

The district court properly applied the principle of party presentation and specifically declined to address the Government's belated historical analogue "arguments." Order, ROA.308. The district court noted that those argument were "untimely" and "constitute[d] an unauthorized second bite at the apple." Order, ROA.308. Accordingly, the Government has forfeited those arguments.

> **2.** **The Government's arguments, as presented, do not satisfy the *Bruen* test.**

The Government's entire argument to the district court, then, can be summarized as follows: First, beginning in 2001, the Fifth Circuit upheld § 922(g)(1) as constitutional. *Heller*'s *dicta* stated that disarming felons is a "longstanding tradition." The Fifth Circuit subsequently held that its precedent was consistent with *Helle*r; therefore, § 922(g)(1) is constitutional. Second, *Bruen* did not abrogate *Heller*, and *Bruen* limits the Second Amendment to "law-abiding, responsible citizens" who challenge permitting and licensing schemes. It does not apply to federal criminal firearm restrictions; therefore, § 922(g)(1) is constitutional.

> **a.** ***Heller*'s *dicta* and pre-*Bruen* decisions from this Court do not satisfy the *Bruen* test.**

In 2001, this Court issued a decision finding § 922(g)(8), which prohibits firearm possession by persons under a domestic violence restraining order, constitutional under the Second Amendment. *See United States v. Emerson*, 260 F.3d 203 (5th Cir. 2001) (abrogation recognized by *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023). In *Emerson*, this Court analyzed the history of the development and ratification of the Second Amendment and held that the Second Amendment is an individual right, rather than a collective right. *See Emerson*, 270 F.3d at 236-60. This Court also held, however, that the Government has the authority to impose "limited, narrowly tailored specific exception or restrictions" on Second

Amendment rights. *Id.* at 261. In other words, § 922(g)(8) was constitutional because it satisfied the means-end scrutiny test.

This Court subsequently dismissed Second Amendment challenges to § 922(g)(1) in three separate cases. *See United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003), *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004); and *United States v. Mares*, 402 F.3d 511, 516 (5th Cir. 2005). All three of those cases relied on the reasoning of *Emerson* to hold that felon in possession laws "are not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Darrington*, 351 F.3d at 633-34 (quoting *Emerson*, 270 F.3d at 261).

After the Supreme Court issued its decision in *Heller*, this Court continued to uphold § 922(g)(1) as constitutional in the context of the Second Amendment. *See, e.g., United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010). In those cases, this Court reasoned that "Dicta in *Heller* states that the opinion should not 'be taken to cast doubt on long-standing prohibitions on possession of firearms by felons,' 128 S.Ct. at 2816–17, and we have reaffirmed our prior jurisprudence on this point since *Heller* was decided. *See United States v. Anderson,* 559 F.3d 348, 352 (5th Cir. 2009), *abrogated on other grounds*, *United States v. Kelley*, 40 F.4th 276, 276 (5th Cir.

2022) (holding that "*Heller* provides no basis for reconsidering *Darrington*.") Again, this Court engaged in means-end scrutiny to uphold § 922(g)(1).

The Government argues that because the Fifth Circuit continued to uphold subsections of § 922(g) after the Supreme Court issued its decision in *Heller*, this Court should hold that pre-*Bruen* decisions upholding § 922(g)(1) still stand. It contends that *Bruen* does not abrogate any of this Court's pre-*Bruen* § 922(g)(1) decisions.

*Rahimi* forecloses the Government's argument. In *Rahimi*, the Fifth Circuit held explicitly that its pre-*Bruen* cases on § 922(g)(8) – including *Emerson* – were "obsolete" even though the Supreme Court did not "overtly overrule" those cases by citing to them in *Bruen*. *Rahimi*, 61 F.4th at 450-51 The Fifth Circuit reasoned that "*Bruen* clearly 'fundamentally changed' our analysis of laws that implicate the Second Amendment." *Id.* at 450. That fundamental change in Second Amendment also applies to all pre-*Bruen* § 922(g)(1) decisions.[7]

---

[7] . The Government also contends that *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021), supports its argument that pre-*Bruen* § 922(g)(1) cases are still good law. Notably, in finding that its Second Amendment jurisprudence was obsolete, the Fifth Circuit cited *In re Bonvillian Marine Serv., Inc.*, and stated the opposite: "The Supreme Court need not expressly overrule our precedent. 'Rather, a latter panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law.'" *Rahimi*, 61 F.4th at 450. The same reasoning that applied to § 922(g)(8) cases in *Rahimi* should apply to § 922(g)(1) cases. The Government should not be permitted to succeed in its argument by relying on a legal test (means-end scrutiny) that the Supreme Court has specifically held to be unconstitutional.

Those pre-*Bruen* decisions no longer apply to Second Amendment cases. First, *Darrington* and *Emerson* reference "narrowly tailored" exceptions to the Second Amendment, language that tracks with the means-end scrutiny the Supreme Court explicitly rejected in *Bruen*. Second, passing references to history fail to meet the rigorous historical analysis standard that *Bruen* requires. *Darrington* and *Emerson* both assume that felon in possession statutes are historically sound, but those cases contain no analysis of the history of disarming felons.

Nor has the Fifth Circuit issued any decision applying the *Bruen* test to the question of the constitutionality of § 922(g)(1). The Fifth Circuit has held only that the plain error doctrine does not apply to § 922(g)(1) *Bruen* challenges that were not preserved at the trial level. *See, e.g., United States v. Washington*, No. 22-10574, 2023 WL 5275013 (5th Cir. Aug. 16, 2023) (noting that the court had not yet addressed the constitutionality of § 922(g)(1) but had applied *Bruen* to strike down § 922(g)(8)). Since *Washington* was decided, the Fifth Circuit has also applied *Bruen* to find that § 922(g)(3) was unconstitutional as applied, further indicating that pre-*Bruen* Second Amendment jurisprudence is no longer applicable. *See United States v. Daniels*, 77 F.4th at 342-43, 344, 351-52 (relying on the decision in *Rahimi* to guide the analysis in *Daniels*). Accordingly, the Government's reliance on pre-*Bruen* § 922(g)(1) cases is improper.

The district court did not err in finding that *Bruen* abrogated this Court's earlier decision, in large part because this Court had already reached the same conclusion in *Rahimi*. 61 F.4th at 450-51 (holding that "Bruen clearly 'fundamentally change[d]' our analysis of laws that implicate the Second Amendment, [] rendering our prior precedent obsolete." (internal citation omitted).

b.   **The Second Amendment is not limited to "law-abiding, responsible citizens," and Mr. Bullock is one of "the people" protected by the Second Amendment.**

The Government also contends that *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), definitively establish that all felons shall be completely and permanently disarmed and that *Bruen* did not alter those decisions. Not so. First, as *this* Court has already held, the language referencing felons in *Heller* and *McDonald* is *dicta*. *See Anderson,* 559 F.3d at 352. The Supreme Court did not perform *Bruen*'s history and tradition test in those cases and conclude that all felons should permanently lose their Second Amendment rights. *Heller*, 554 U.S. at 570; *McDonald*, 561 U.S. at 742.

Second, the Supreme Court has recently reiterated that police and courts should take a more nuanced approach to the issue of felonies in the context of Fourth Amendment. In the term before *Bruen*, the Court noted that "a felon is not always more dangerous than a misdemeanant." *Lange v. California*, 141 S. Ct. 2011 (2021) (quoting *Tennessee v. Garner*, 471 U.S. 1, 14 (1985)). The Supreme Court also

indicated just last month, during oral argument in *United States v. Rahimi*, that

dangerousness should factor into the *Bruen* analysis. *See* Transcript of Oral

Argument at 13-22, 25-26, 31-33, *United States v. Rahimi*, No. 22-915 (Nov. 7,

2023). That position is consistent with then-Judge Barrett's position in *Kanter*, 919

F.3d at 452 (Barrett, J., dissenting). Mr. Bullock discusses this issue in more depth,

*infra*, but raises the point here that the Government's reliance on *dicta* is not

supported by the Court's more substantive analyses of felonies in general.

The Government contends that Mr. Bullock is not one of "the people"

protected by the Second Amendment because this country historically excluded

people with a felony conviction from "the people." The Government's analysis is

misplaced.

First, the Government cites Thomas M. Cooley's treatise for the proposition

that "[c]ertain classes . . . including 'the idiot, the lunatic, and the felon, on obvious

grounds" are not "the people" as the Constitution defines that term. The full

proposition frames the term "the people" as including only those people entitled to

the vote, not people endowed with the right to keep and bear arms. Thomas M.

Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the

Legislative Power of the States of the American Union* 28-29 (1st ed. 1868). In

addition to that point, the Government's citation to Cooley's treatise has a broader

constitutional problem – the "[c]ertain classes" excluded from the vote also included

"the slave because he is assumed to be wanting alike in the intelligence and the freedom of will essential to the proper exercise of the right" and "the woman, from mixed motives, but mainly perhaps, because, in the natural relation of marriage, she was supposed to be under the influence of her husband." *Id.* at 29.

The Supreme Court disagrees with Cooley's narrow definition of "the people," and its interpretation controls. In *Heller*, the Supreme Court conducted a textual and historical analysis of the Second Amendment, including the phrase "right of the people." *Heller*, 554 U.S. at 579-81. The Supreme Court focused on the term "the people" as it is used in the Constitution. *See id.* The Constitution also references "the people" in the First, Fourth, and Ninth Amendments. *See id.* at 579. In each case, the Constitution references an individual right, such as the right to assemble, to petition the government, and to be free from unreasonable searches and seizures. *See id.* at 579-80. In each case, "the term [also] unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The *Heller* court concluded that "[w]e start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

The *Bruen* test adopts this approach by focusing not on status, but on conduct. *Bruen*, 142 S. Ct. at 2129-30. *Bruen* holds, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that

conduct." *Bruen*, 142 S. Ct. at 2129-30. Relying on conduct focuses the inquiry on the scope of the right as it is stated in the Second Amendment but does not prevent proper restrictions on the right to possess a firearm. *See Range v. Attorney General United States of America*, 69 F.4th 96, 102 (3d Cir. 2023) (*en banc*). As then-Judge Barrett wrote in a pre-*Bruen* decision, "history and tradition support Congress's power to strip certain groups of th[e] right [to keep and bear arms]." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). The proper approach, however, utilizes history and tradition "to identify the scope of the legislature's power to take it away" – not "to identify the scope of the right" itself. *Id.*

Relying on conduct, rather than the phrases "law-abiding" or "responsible," also prevents an inconsistent application of the Second Amendment. *See Range*, 69 F.4th at 102-03. The Third Circuit rejected the "law-abiding" *dictum* when it decided *Range*, finding it "expansive" and "vague" and expressing concern that relying on labels rather than conduct "gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Id*. at 102-03 (quoting *Folajtar v. Attorney General*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting).[8]

---

[8] This Court, in *Rahimi* and *Daniels*, also stated in *dicta* that felons are likely excluded from Second Amendment protections because they are not "the people." *Daniels*, 77 F.4th at 343; *Rahimi*, 61 F.4th at 452. *Rahimi*'s *dicta* relies heavily on the Third Circuit's panel decision in *Range*, which has since been reversed to hold that felons are part of "the people." *See Rahimi*, 61 F.4th at 452. *Daniels*'s *dicta*, in turn, relies on *Rahimi*. *See Daniels*, 77 F.4th at 343. For the reasons set forth above, this Court should disregard its own *dicta* and apply the *Bruen* test as written.

This analysis echoes then-Judge Barrett's concerns about putting the cart before the horse, which is what the Government argues here. The Government attempts to obfuscate the Supreme Court's clear statement by arguing that shorthand references to "law-abiding citizens" in *Heller* and *Bruen* foreclose Mr. Bullock from asserting the protection of the Second Amendment. The Government also seeks to limit the scope of the Second Amendment right rather than providing historical analogues that support a restriction of the right by conflating the first step of *Bruen* (conduct) with the second step (historical analogues). *See United States v. Forbis*, No. 4:23-cr-133-GKF (N.D. Okla. Aug. 17, 2023), ECF No. 37 at 5.

The *dicta* from *Heller* and *Bruen* does not control – the Supreme Court's analysis does. If this Court decides to reverse the district court's decision, it should do so because there is a historical tradition of depriving people like Mr. Bullock of their Second Amendment rights – not because Mr. Bullock is not one of "the people."

In this case, Mr. Bullock possessed a firearm. Under *Bruen*, the Second Amendment protects that right unless the Government can justify Congress's restriction on that right by demonstrating a history and tradition of completely and permanently disarming persons with a felony conviction. The district court's holding at *Bruen* step one was correct and should be affirmed.

### c.    The Government has failed to meet its burden because its position is inconsistent with the *Bruen* test.

The Government took the position in the trial court that *Bruen* did not require it to provide any proof of historic analogues to justify the total and permanent deprivation of Mr. Bullock's Second Amendment rights because *Heller* identified the ban on felons in possession as "a longstanding prohibition." Heller, 554 U.S. at 627, n. 6. The Government's argument fails for two reasons.

First, as Mr. Bullock established *supra*, *dicta* does not control in the face of *Bruen*'s test explicitly requiring historical analysis of restrictions on the Second Amendment. Second, *Heller* also states that its list of "longstanding prohibitions," which included those people with felony convictions, is only "presumptively lawful." *See id.* The Government must still establish that those restrictions are either distinctly similar or relevantly similar to historical restrictions on Second Amendment rights. *See Bruen*, 142 S.Ct. at 2131-32.

The Government did not do so. As the district court held, "[m]issing from this brief, in sum, is any example of how American history supports § 922(g)(1), much less the number of examples *Bruen* requires to constitute a well-established tradition. The government has, therefore, not met its burden." Order, ROA.306. Accordingly, the district court did not err in finding that the Government had not met its burden to show that § 922(g)(1) was unconstitutional as applied to Mr. Bullock.

**D.    The district court correctly held that § 922(g)(1) was unconstitutional as applied to Mr. Bullock because the Government's proffered analogues are not consistent with "this Nation's historic tradition of firearm regulation."**

Even if this Court were to consider the Government's proffered analogues, the Government has not met its burden to justify the complete and permanent deprivation of Mr. Bullock's Second Amendment rights. The Government argues generally that the prohibition of § 922(g)(1) are consistent with two historical traditions: (1) allowing capital punishment and estate forfeiture for felony convictions; and (2) disarming groups that the Government determined were dangerous.

**1.    There is no historical tradition of permanently disarming felons by requiring estate forfeiture or by imposing the ultimate deprivation of rights – loss of life by capital punishment.[9]**

First, the historical evidence disproves the Government's general assertions regarding capital punishment and estate forfeiture. The 1790 Crimes Act was the first federal criminal statute. Crimes Act of 1790, ch. 9, 1 Stat. 112. In it, Congress

---

[9] Mr. Bullock again notes, as he did in his motion to dismiss, that the Government has reversed its position on the historical underpinnings of § 922(g)(1). Motion to Dismiss, ROA.157. The district court addressed this argument in its order and observed that "in cases litigated not that long ago, the U.S. Department of Justice formally advanced the position that early American history did *not* support felon disarmament." Order, ROA.302 (citations omitted). Mr. Bullock agrees with the district court's statement that "[g]iven *Bruen*'s demanding standard, these admissions suggested that the government had its work cut out for it." Order, ROA.303.

enumerated twenty-three felony crimes, whose punishments ranged from a mandatory death penalty to fines and corporal punishment. *See* United States Sentencing Commission, History of Mandatory Minimum Penalties and Statutory Relief Mechanisms, https://tinyurl.com/1790USSC. Only seven of the twenty-three felonies required a mandatory death sentence: "treason murder, three offenses relating to piracy, forgery of a public security of the United States, and the rescue of a person convicted of a capital crime." *See id.* at 7. Section 24 of the Act specifically eliminates "forfeiture of estate" the list of available punishments for the enumerated felonies. Crimes Act of 1790, ch. 9, 1 Stat. 112. Capital punishment continued to decline, but the number of felonies began to rise. Order, ROA.298. By the early 19th century, there were "many felonies, not one punished with forfeiture of estate, and but a very few with death." Order, ROA.298 (quoting Christina Mulligan et al., *Founding-Era Translations of the U.S. Constitution*, 31 Const. Comment 1, 45-46 (citation and quotation marks omitted).

The Crimes Act of 1790, which represents the federal government's view of the term "felony" at the time of the Founding was an outlier. As the district court discussed in its decision, felony was an undefined term. Order, ROA.296-300. The district court relied on multiple scholarly works and the reasoning of then-Judge Barrett in its analysis. Order, ROA.296-300. As then-Judge Barrett noted in her dissent in *Kanter*, Founder James Madison viewed the term "felony" as one "of loose

signification even in the common law of England," but especially in the fledgling United States, where "[t]he meaning of the term . . . .[was] not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting); Order, ROA.298-99. The Supreme Court has also recognized that at the time of the Founding, "[t]he felony category was a good deal narrower than now. Many modern felonies were 'classified as misdemeanors' at common law. . . ." *Lange*, 141 S. Ct. at 2023 (citing *Garner*, 471 U.S. at 13-14).

Additionally, the term felony is no longer narrowly defined. *See Forbis*, No. 4:23-cr-133-GKF, ECF No. 37 at 9 (relying on *Range*, 69 F.4th at 102). "[T]oday, felonies include a wide swath of crimes, some of which seem minor;" therefore, "[s]imply lumping all felons together is insufficient to satisfy the government's burden in this as-applied challenge." *Id.* One 2022 study from the Heritage Foundation estimates that there are over 5,000 felony crimes in the United States Code alone. *See* https://tinyurl.com/felonycount (last visited December 1, 2023). The Supreme Court has also recognized that at the time of the Founding, "[t]he felony category was a good deal narrower than now. Many modern felonies were 'classified as misdemeanors' at common law. . . ." *Lange*, 141 S. Ct. at 2023 (citing *Garner*, 471 U.S. at 13-14).

The district court correctly held that the "capital punishment" analogue was not sufficient to meet the Government's burden to justify § 922(g)(1)'s total and permanent ban on Second Amendment rights.

On appeal, the Government proffers two additional colonial statutes. The Government describes one statute as "providing that a person who was convicted of 'libel[ing] or defam[ing]' certain colonial resolutions 'shall be disarmed and not allowed to have or keep any arms." Initial Br. at 30 (quoting Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive* 193). The Government fails to define those "certain colonial resolutions," but the text of the law[10] makes clear that statute did not pertain to regular crimes. Rather, it was a security regulation intended to disarm British Loyalists. *See id.* at 193. The second proffered analogue, known as Dale's Laws, was a list of crimes decreed by Virginia's first Governor, Thomas Dale, to be punishable by death. *See* https://tinyurl.com/daleslaws (last visited Dec. 1, 2023). Dale's Laws were not legislative creations, but a fiat from a leader who believed that taking God's name in vain should be punishable by death. *See id.*

---

[10] The law states that whoever "shall libel or defame any of the resolves of the Honorable Congress of the United Colonies, or the act and proceedings of the General Assembly of this Colony, made or which hereafter shall be made for the defense or security of the rights and privileges of the same" shall, upon conviction be disarmed and face the loss of other rights. Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive* 193.

Neither of these proffered analogues are either distinctly or relevantly similar to § 922(g)(1). In fact, both would likely be considered unconstitutional under the First Amendment. However, even if the Government's proffered analogues were applicable, as this Court noted in *Daniels*, these analogues "are notably few. The *Bruen* Court doubted that three colonial-era laws could suffice to show a tradition." *Daniels*, 77 F.4th at 347 (citing *Bruen*, 142 S. Ct. at 2142). The Government's proffered analogues cannot overcome the district court's correct application of the *Bruen* test.

### 2. The Government's dangerousness argument fails as applied to Mr. Bullock.

Second, the *Daniels* decision holds that the Government cannot succeed on a dangerousness or untrustworthiness argument without providing specific historical examples." *See Daniels*, 77 F.4th at 350-52. Very often those historical analogues were based in a fear of minorities or were intended to limit the rights of people that the Founders did not find worthy – the enslaved, Native Americans, and religious minorities (Catholics). *See id.* at 354-55. Similarly, *Rahimi* held that historical analogues related to dangerousness were intended to preserve "the political and social order" and prevent political or violent uprisings. *Rahimi*, 61 F.4th at 456-57.

The Government uses the general terminology for Mr. Bullock's prior convictions to identify him as dangerous. Initial Br. at 40-42. The Government also

cites, for the first time, statistics on recidivism as proof of dangerousness. Initial Br. at 40-42.

The district court addressed the argument on dangerousness in its order. Order, ROA.301, 308. The district court concluded that, even on the merits, the Government had failed to establish (1) "that there is a historical tradition of disarming either the violent of the dangerous" or (2) that Mr. Bullock's record was consistent with that historical tradition. Order, ROA.308. The district court held that "Mr. Bullock has a criminal history, yes. Armed with that knowledge, though, the government put forth no effort to ground in history the present charges it brought again him. That is what *Bruen* requires." Order, ROA.309. The Government failed to meet its burden.

## VI.    CONCLUSION

Based on the argument presented above, this Court should deny the Government's appeal and affirm the district court's order dismissing the indictment. The district court's narrow ruling correctly held that 18 U.S.C. § 922(g)(1) is unconstitutional as violative of the Second Amendment as applied to Mr. Bullock.

Submitted this 4th day of December, 2023.

**Omodare B. Jupiter**
Federal Public Defender

*/s/ Michael L. Scott*
Attorney for Defendant-Appellant

## <u>CERTIFICATE OF SERVICE</u>

I, Michael L. Scott, certify that on December 4, 2023, a copy of the Brief for Appellee was filed via this Court's electronic case filing system, which in turn forwarded electronic copies of the Brief to all counsel of record in this case. A copy of the Brief for Appellee was emailed directly to the government's lead counsel. Additionally, a copy of the Brief for Appellee was emailed to Mr. Bullock.

<u>*s/ Michael L. Scott*</u>
**Michael L. Scott**
Senior Litigator

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this document contains 9,625 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionately spaced typeface using Microsoft Word in 14-point font size and Times New Roman type style.

<u>*s/ Michael L. Scott*</u>
**Michael L. Scott**
Assistant Federal Public Defender