No. 23-60408

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

JESSIE BULLOCK,
Defendant–Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NO. 18-CR-165 (HON. CARLTON W. REEVES)

## REPLY BRIEF FOR THE UNITED STATES

TODD W. GEE
United States Attorney

GAINES CLEVELAND
Appellate Chief

JENNIFER CASE
Deputy Appellate Chief
Southern District of Mississippi

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION .................................................................................. 1

ARGUMENT ......................................................................................... 2

I.    The District Court Erred by Concluding That *Bruen* "Expressly Abrogated" This Court's Pre-Existing Precedent Upholding Section 922(g)(1) Under the Second Amendment. ....... 2

II.    Under *Bruen*, Section 922(g)(1) is Constitutional as Applied to Felons, Including Bullock ............................................................ 6

    A.    The government's *Bruen* arguments are properly before this Court. ...................................................................... 6

    B.    The Second Amendment's text, as historically understood, does not cover convicted felons like Bullock ........................................................................... 10

    C.    There is a historical tradition for disarming felons. ........... 17

    D.    At a minimum, there is a historical tradition for disarming dangerous felons, like Bullock. ........................ 21

CONCLUSION ...................................................................................... 25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Barrett v. United States*,
    423 U.S. 212 (1976) .............................................................................. 24

*Baze v. Rees*,
    553 U.S. 35 (2008) ................................................................................ 19

*Binderup v. Att'y Gen.*,
    836 F.3d 336 (3d Cir. 2016) (en banc) .................................................. 22

*Blanton v. City of North Las Vegas*,
    489 U.S. 538 (1989) .............................................................................. 20

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) .............................................................................. 20

*Danforth v. Minnesota*,
    552 U.S. 264 (2008) .............................................................................. 15

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................................... 2, 4, 12, 14

*Folajtar v. Att'y Gen.*,
    980 F.3d 897 (3d Cir. 2020) (en banc) .................................................. 15

*In re Bonvillian Marine Serv., Inc.*,
    19 F.4th 787 (5th Cir. 2021) ................................................................... 3

*Kamen v. Kemper Financial Services, Inc.*,
    500 U.S. 90 (1991) ......................................................................... 6, 7, 9

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ................................................................. 22

*Lewis v. United States*,
    518 U.S. 322 (1996) .............................................................................. 20

*Medina v. Whitaker,*
    913 F.3d 152 (D.C. Cir. 2019) ............................................................11, 15

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022).................................................................................*passim*

*Range v. Att'y Gen.,*
    69 F.4th 96 (3d Cir. 2023) (en banc) ...................................................... 16

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ...................................................................................6

*Teter v. Lopez,*
    76 F.4th 938 (9th Cir. 2023) .......................................................................8

*United States v. Anderson,*
    559 F.3d 348 (5th Cir. 2009) ............................................................2, 4, 16

*United States v. Daniels,*
    77 F.4th 337 (5th Cir. 2023) .......................................................................5

*United States v. Darrington,*
    351 F.3d 632 (5th Cir. 2003) ................................................................. 2, 3

*United States v. Emerson,*
    270 F.3d 203 (5th Cir. 2001) .......................................................................3

*United States v. Everist,*
    368 F.3d 517 (5th Cir. 2004) .......................................................................2

*United States v. Jackson,*
    85 F.4th 468 (8th Cir. 2023) .................................................................... 22

*United States v. Jones,*
    565 U.S. 400 (2012) ............................................................................. 9, 10

*United States v. Miller,*
    307 U.S. 174 (1939) ...................................................................................3

*United States v. Mix,*
    791 F.3d 603 (5th Cir. 2015) .................................................................. 10

*United States v. Piazza*,
   647 F.3d 559 (5th Cir. 2011) .................................................. 10

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir. 2023) ........................................ 5, 16, 22

*United States v. Sineneng-Smith*,
   140 S. Ct. 1575 (2020) ............................................................ 7

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) .............................................................. 12

*Wood v. Milyard*,
   566 U.S. 463 (2012) ................................................................ 7

*Yee v. City of Escondido*,
   503 U.S. 519 (1992) ......................................................... 6, 7, 9

**Statutes and Constitutional Provisions**

U.S. Const. Pmbl ...................................................................... 12

U.S. Const. art. I, § 2, cl. 1 ....................................................... 12

U.S. Const. amend. V ................................................................ 20

U.S. Const. amend. X ................................................................ 12

U.S. Const. amend. XVII, cl. 1 .................................................. 12

U.S. Const. amend. XVII, cl. 2 .................................................. 12

18 U.S.C. § 3142 ...................................................................... 23

18 U.S.C. § 921 ........................................................................ 20

18 U.S.C. § 922 ........................................................................ 20

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights* (1998) .................................. 11

iv

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ........................................................................................ 19

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .......... 23

Stuart Banner, *The Death Penalty: An American History* (2002) ........................ 19

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) ................................................................................................ 11

# INTRODUCTION

The district court erred by holding that 18 U.S.C. § 922(g)(1)'s prohibition on the possession of firearms by felons violates the Second Amendment as applied to Jessie Bullock, who has multiple convictions for violent felony offenses, including manslaughter and aggravated assault. The district court was bound by this Court's pre-*Bruen* decisions upholding Section 922(g)(1) under the Second Amendment. And contrary to the district court's determination, Section 922(g)(1) is constitutional because the Second Amendment does not extend to felons. But even if it did, Section 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022).

Bullock fails to rebut the government's arguments and instead defends the district court's judgment by repeating much of its reasoning. But as the government explained in its opening brief, the district court's reasoning conflicts with the overwhelming majority of other district court decisions in this circuit to consider Section 922(g)(1)'s constitutionality, and it employs a restrictive reading of *Bruen*. This Court should reverse.

## ARGUMENT

**I.   The District Court Erred by Concluding That *Bruen* "Expressly Abrogated" This Court's Pre-Existing Precedent Upholding Section 922(g)(1) Under the Second Amendment.**

As the government explained in its opening brief (at 12-18), this Court has held—both before and after the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008)—that Section 922(g)(1) is constitutional under the Second Amendment. In *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003), this Court held that Section 922(g)(1) did not infringe on the Second Amendment right to bear arms, observing that the right is subject to restrictions that are consistent "with the right of Americans generally to individually keep and bear . . . arms as historically understood in this country," and concluding that "legislative prohibitions on the ownership of firearms by felons are not considered infringements on the historically understood right to bear arms protected by the Second Amendment." *Id.* at 634 (quotation omitted); *see also United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) (reasoning that "[i]t is not inconsistent with the Second Amendment to limit the ability of convicted felons to keep and possess firearms"); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) (reaffirming *Darrington* post-*Heller*), *abrogation on other grounds recognized by United States v. Kelley*, 40 F.4th 276 (5th Cir. 2022). *Bruen* did not

"unequivocally overrule[]" those decisions. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (quotation omitted); *see* Gov't Opening Br. 15-18.

Bullock asserts (Resp. Br. 28-30) that *Darrington* is no longer good law because that decision relied on *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001), *abrogation recognized by United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), which employed "means-end scrutiny" to uphold Section 922(g)(8)'s prohibition on firearm possession by those subject to domestic-violence restraining orders. Resp. Br. 28. But *Darrington* did not rely on *Emerson*'s application of means-end scrutiny to uphold Section 922(g)(1). Rather, *Darrington* relied on a separate discussion in *Emerson* explaining that "it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms." *Darrington*, 351 F.3d at 634 (quoting *Emerson*, 270 F.3d at 261). For that proposition, *Emerson* relied not only on Supreme Court cases, such as *United States v. Miller*, 307 U.S. 174 (1939), but also on academic articles opining that the founding generation did not understand felons to have a right to bear arms. *Emerson*, 270 F.3d at 226 n.21. Citing those sources, *Darrington* observed that felon-dispossession laws are consistent with "the historically understood right to bear arms protected by the Second Amendment." *Darrington*, 351 F.3d at 634 (citing *Emerson*, 270 F.3d at 226 n.21). *Darrington*'s conclusion that Section 922(g)(1) does not violate the Second Amendment was

grounded in its observation that restrictions on the possession of firearms by felons are historically grounded. That decision is entirely consistent with *Bruen*.

Bullock's contention (Resp. Br. 30) that *Darrington*'s discussion of the historical basis for Section 922(g)(1) is not rigorous enough to satisfy *Bruen* misreads *Bruen*, which did not require that courts of appeals revisit circuit decisions that were "broadly consistent with *Heller*." *Bruen*, 597 U.S. at 19. To the contrary, *Bruen* reiterated *Heller*'s general approach and endorsed decisions that hewed to *Heller*'s historical focus. And the Justices who joined the Court's decision specifically reiterated that firearm-dispossession laws remained presumptively lawful under *Heller*. *See id.* at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."); *id.* at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating *Heller*'s assurances that felons can be dispossessed of firearms); *id.* at 129 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on" *Heller*'s statements about felon-in-possession laws). This Court's precedents, including its post-*Heller* decisions reaffirming *Darrington* and invoking the Supreme Court's assurances that it was casting no "doubt on longstanding prohibitions on the possession of firearms by felons," *Anderson*, 559 F.3d at 352 n.6 (quoting *Heller*, 554 U.S. at 626), are "broadly

consistent with *Heller*" and *Bruen*. The district court was thus bound to apply them.

Finally, Bullock argues that this Court's post-*Bruen* decisions in *Rahimi* and *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), indicate that *Bruen* "fundamentally changed" this Court's precedent upholding Section 922(g)(1) under the Second Amendment. *Rahimi*, 61 F.4th at 450. But neither decision undermined the textual or historical bases for disarming *felons*, even though each found (erroneously in the government's view) that a different provision in Section 922(g) was unconstitutional. To the contrary, both *Rahimi* and *Daniels* recognized that "felons . . . were historically stripped of their Second Amendment rights." *Daniels*, 77 F.4th at 343 (quotation omitted); *see Rahimi*, 61 F.4th at 452 (explaining that "*Heller*'s reference to 'law-abiding, responsible' citizens" referred to "groups that have historically been stripped of their Second Amendment rights," such as "felons"). And in *Rahimi*, the concurring judge expressed the view that "the government can presumably disarm dangerous convicted felons, whether they're incarcerated or not, without violating the Second Amendment." *Rahimi*, 61 F.4th at 464 (Ho, J., concurring). *Rahimi* therefore does not undermine the government's position that the district court was bound to apply pre-*Bruen* precedent upholding Section 922(g)(1).

**II.    Under *Bruen*, Section 922(g)(1) is Constitutional as Applied to Felons, Including Bullock.**

Section 922(g)(1) passes constitutional muster even under a fresh application of *Bruen*. The district court erred by concluding otherwise.

A.    <u>The government's *Bruen* arguments are properly before this Court.</u>

As explained in the government's opening brief (at 42-44), the government's argument that Section 922(g)(1) is constitutional even under a fresh application of *Bruen* is properly before this Court. In rejecting the government's primary argument that it was bound by this Court's pre-existing precedent upholding Section 922(g)(1) under the Second Amendment, the district court considered and rejected, *i.e.*, "passed upon," the *Bruen*-based arguments the government advances on appeal. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *see* ROA.303-305, 308. This was sufficient to preserve those arguments for this Court's review. *Singleton*, 428 U.S. at 120. Alternatively, because the sole legal issue before the district court was Section 922(g)(1)'s constitutionality under the Second Amendment, the government is permitted to advance additional or alternative legal arguments in support of its position on appeal. *See Yee v. City of Escondido*, 503 U.S. 519, 534 (1992); *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991).

Bullock does not dispute that the district court "passed upon" the question of Section 922(g)(1)'s constitutionality under *Bruen*. Bullock nevertheless

contends that this Court is foreclosed from considering it. But his arguments are unavailing.

Bullock primarily contends (Resp. Br. 25-26) that the party-presentation principle forecloses this Court's consideration of the government's historical arguments.[1] Under the principle of party presentation, a court should generally consider only the issues and arguments presented by the parties. *Wood v. Milyard*, 566 U.S. 463, 472 (2012). But "[t]he party presentation principle is supple, not ironclad." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). "[A] court is not hidebound by the precise arguments of counsel," *id.* at 1581, but instead retains leeway to apply the proper construction of law, *Kamen*, 500 U.S. at 99. *See Yee*, 503 U.S. at 534 (parties that properly present an issue "are not limited to the precise arguments they made below"). Where new or alternative arguments are consistent with arguments the parties made below, a court is well within its discretion to consider them. *Cf. Sineneng-Smith*, 140 S. Ct. at 1581

---

[1] Bullock asks this Court to "deny the Government's appeal under the principle of party presentation." Resp. Br. 23. To the extent Bullock suggests that the government lacks *any* basis to appeal the district court's judgment, he is wrong. The government unquestionably preserved the primary argument it makes on appeal: that *Bruen* did not abrogate this Court's pre-existing decisions upholding Section 922(g)(1) under the Second Amendment. At a minimum, that question is properly before this Court.

(reversing circuit court's order dismissing claim based on legal argument *contrary* to that presented by the parties).

The party-presentation principle does not foreclose review for several reasons. First, as a factual matter, the government argued below that Section 922(g)(1) "is part of the historical tradition of regulating firearms possession," ROA.148, and that, should the court disagree with the government's primary argument that it was bound to uphold the statute under pre-*Bruen* precedent, the government would present historical sources justifying the statute under *Bruen*, ROA.196 (representing that the government was "ready to submit" historical sources and "more detailed briefing"). Though not a comprehensive explication of the government's authority to disarm Bullock under *Bruen*, this—combined with the government's provision of district court decisions upholding Section 922(g)(1) under *Bruen*, ROA.203-206—was sufficient to preserve the government's arguments regarding the sole issue before the district court.

Second, and relatedly, that the government did not provide its historical sources in the district court does not preclude the government from providing those sources on appeal. As explained in the government's opening brief (at 43-44), *Bruen* requires courts to conduct a *legal* inquiry into the text and history of the Second Amendment. *See Teter v. Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023).

This Court may thus rely on legal arguments that are raised, and historical sources that are cited, for the first time on appeal.

Bullock contends that because the government "was not the petitioner below and has raised no claims of its own," it may not advance its *Bruen*-based arguments on appeal. Resp. Br. 25. He argues that the cases cited by the government, *Yee* and *Kamen*, only permit a federal *claimant* to raise new arguments on appeal. Resp. Br. 25. But *Yee* and *Kamen* are not so limited; rather, both decisions confirm that arguments in support of a claim may evolve and that a court may consider consistent, non-waived arguments regarding an issue for the first time on appeal. *See Yee*, 503 U.S. at 535 (distinguishing between "claims" that might be forfeited by parties and "separate arguments in support of a single claim") (emphasis omitted); *Kamen*, 500 U.S. at 99 (explaining that "[w]hen *an issue* or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law") (emphasis added). Because the issue of Section 922(g)(1)'s constitutionality is before this Court, the Court can properly consider the government's legal argument that the statute is constitutional under *Bruen*.

The cases Bullock cites (Resp. Br. 25-26) are not to the contrary. In *United States v. Jones*, 565 U.S. 400, 413 (2012), the Supreme Court declined to address

an alternative argument that had not been raised at any point below and that the court of appeals "did not address." Likewise, in *United States v. Mix*, 791 F.3d 603, 611-12 (5th Cir. 2015), and *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011), this Court treated as forfeited arguments the government raised for the first time on appeal and that the district court did not address. But the Supreme Court's and this Court's decisions to not opine on issues that were not addressed by lower courts does not suggest that this Court should not consider all relevant legal authority when ruling on a claim that *was* "address[ed]" below. *Jones*, 565 U.S. at 413. Here, the district court passed upon the very arguments the government asks this Court to review. The government's arguments are therefore properly before this Court.

B.    The Second Amendment's text, as historically understood, does not cover convicted felons like Bullock.

As the government explained in its opening brief (at 22-28), the Second Amendment's text does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses. That is so for two reasons. First, felons are not among "the people" covered by the Second Amendment. *See* Gov't Opening Br. 22-24. And second, "the right . . . to keep and bear Arms" has historically been understood to extend to law-abiding citizens and is not "infringed" by

longstanding regulations prohibiting felons from possessing firearms due to their convictions. *See* Gov't Opening Br. 25-28.

Bullock seizes on *Heller*'s statement that the Second Amendment extends to "all members of the political community" to argue that, despite his felon status, he is among "the people" protected by the Second Amendment. Resp. Br. 32-33 (quotation omitted). But as the government explained in its opening brief (at 23-24), the commission of a felony offense has historically resulted in the "forfeiture of a number of rights" tied to membership in the political community. *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019); *see also* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). This has included not only rights associated with voting and the franchise, as Bullock contends (Resp. Br. 32-33), but also the right to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998) (explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").[2]

---

[2] Bullock challenges (Resp. Br. 32-33) the government's citation to Cooley's treatise, *see* Gov't Opening Br. 23, because it describes the repugnant historical bases for excluding enslaved persons and women from the political community. But as offensive as those historical prohibitions are, they

Contrary to Bullock's suggestion (Resp. Br. 33), this reading is fully consistent with a more expansive meaning of the term "the people" in other provisions of the Constitution. The term "the people" need not bear precisely the same meaning in the Second Amendment that it does elsewhere in the Constitution. While the phrase "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id.* at 581, but certain noncitizens are among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271-73 (1990). The same is true of felons. And many other constitutional provisions use the term "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the [p]eople" who are entitled to elect members of Congress, *see* U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. XVII, cls. 1-2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So too, felons disarmed

_____

demonstrate the broader principle that legislatures historically could exclude certain categories of groups from the political community and that the Second Amendment was not understood to pose an obstacle to disarming, as a class, certain persons.

under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

Bullock next contends that *Bruen*'s "textual" step is concerned only with whether a defendant's *conduct* is covered by the Amendment, not whether his status renders him outside the Amendment's scope. Resp. Br. 33-34. But as the government explained in its opening brief (at 45), this construction of *Bruen*'s textual question is too narrow. The relevant inquiry is whether the Second Amendment's plain text, "as informed by history," permits disarming Bullock. *See Bruen*, 597 U.S. at 19. Thus, the "conduct" burdened by Section 922(g)(1) is not possession of a firearm in the abstract, *see* Resp. Br. 35, but possession of a firearm by someone previously convicted of an offense punishable by more than a year in prison. As a matter of both text and history, the Second Amendment does not prevent disarming Bullock.

For similar reasons, Bullock's claim (Resp. Br. 35) that the government's invocation of history at *Bruen*'s "textual" step improperly "conflat[es]" *Bruen*'s first and second steps is misplaced. As just explained, *Bruen*'s textual question necessarily involves understanding how the Amendment's text was historically understood. *See Bruen*, 597 U.S. at 19 (explaining that *Heller* and *Bruen* "demand[] a test rooted in the Second Amendment's text, *as informed by history*") (emphasis added). When determining what "Arms" are protected by the

Amendment, for example, *Heller* looked at history to determine how that term was historically understood. *Heller*, 554 U.S. at 581-82, 627-28. Similarly, *Heller* looked to history to support a variety of limitations on the "the right" as it was understood at the time. *Id.* at 626-27. *Bruen*'s textual step cannot be divorced from history.

The inquiries under *Bruen* are nevertheless distinct. At *Bruen*'s first step, the question is whether the Second Amendment's text, as informed by history, extends to the defendant, which involves questions about the scope of the right itself and about who has historically enjoyed that right. *Brue*n, 597 U.S. at 17. At *Bruen*'s second step, the question is whether the government may, consistent with the nation's historical tradition of firearm regulation, disarm persons who are otherwise entitled to the Second Amendment's protections. *Id.* As explained in the government's opening brief, a straightforward application of *Bruen*'s text-and-history framework confirms that Section 922(g)(1) is constitutional as applied to Bullock.

Bullock contends (Resp. Br. 31, 37-39) that, because the term "felon" is more expansive than it was when the Second Amendment was ratified, this Court should interpret the Amendment's text narrowly to protect the right of most felony offenders to bear arms. As a threshold matter, Congress has long retained the authority to define which acts warrant "the highest degree of

societal condemnation." *Medina*, 913 F.3d at 160. A proper interpretation of the Second Amendment's text respects legislatures' historical authority to "define crimes [and] punishment." *Danforth v. Minnesota*, 552 U.S. 264, 280 (2008). More than that, though, at least one of Bullock's felony convictions was for an offense that was one of "[t]he nine traditional felonies at common law." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 904 n.9 (3d Cir. 2020), *abrogation recognized by Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc).[3] Thus, there can be no dispute that Bullock would have been subject to severe punishment, including and likely exceeding disarmament, at the founding.

Bullock contends that this Court should disregard its own statements in *Rahimi* and *Daniels* indicating that felons are excluded from the political community and, thus, the Second Amendment's protections. Resp. Br. 34 n.8. But Bullock offers no good reason for doing so. He suggests that *Rahimi* and *Daniels* relied on the Third Circuit's vacated panel decision in *Range* to reach this

---

[3] Bullock's contention (Resp. Br. 31-32) that the Supreme Court "indicated" at oral argument in *United States v. Rahimi,* No. 22-915 (oral argument held Nov. 7, 2023), "that dangerousness should factor into the *Bruen* analysis" places undue emphasis on the Justices statements, which are not authoritative. In any event, Bullock misunderstands the Court's questions, which largely concerned how the Court should assess the Second Amendment rights of "irresponsible" individuals without criminal histories, not those of felons. *See* Oral Argument Transcript, *Rahimi*, No. 22-915, at 10-11, 47-48, 75; *accord id.* at 5-6.

conclusion. But *Rahimi* and *Daniels* relied on *Heller* itself. *See Rahimi*, 61 F.4th at 452 (citing *Heller*'s reference to "'law-abiding, responsible'" citizens).

Nor does the Third Circuit's en banc decision in *Range* help Bullock. *Range*, 69 F.4th 96. *Range* held only that Section 922(g)(1) was unconstitutional as applied to Range, a civil plaintiff whose disqualifying offense was a decades-old state-law misdemeanor conviction for less than $2,500 worth of food-stamp fraud, an offense for which he served no jail time. *Id.* at 98, 106; *see also id.* at 105 (comparing the government's historical analogues to "Range and his individual circumstances"); *id.* at 103 (similar); *id.* at 104 & n.9 (similar). The Third Circuit would not necessarily reach the same result here, where the underlying felony convictions include manslaughter, aggravated assault, and fleeing a law-enforcement officer.

Finally, Bullock contends (Resp. Br. 31) that the district court properly rejected as "dicta" *Heller*'s statements concerning the lawfulness of felon-dispossession laws. But as the government explained in its opening brief (at 45-46), even assuming the statements were dicta, the district court was—and this Court is—bound to apply them. *See Anderson*, 559 F.3d at 352. The district court erred by declining to do so.

16

C.   <u>There is a historical tradition for disarming felons.</u>

As the government explained in its opening brief (at 28-40), our nation has a long-standing tradition of firearm regulation that supports disarming felons like Bullock.[4] Several historical precursors to Section 922(g)(1)—including felony-punishment laws subjecting those who committed serious crimes to death or estate forfeiture; historical laws disarming other criminal offenders and loyalists; and laws disarming persons whose firearm possession posed a danger to society—establish that Congress may lawfully disarm all felons.

---

[4] Bullock's contention that, before *Bruen*, the government argued that "early American history did *not* support felon disarmament," Resp. Br. 37 n.9 (quoting ROA.302-303), is wrong. In *United States v. Staten*, the government's position was materially identical to its current position: although Section 922(g)(1) lacks an *identical* historical precursor, several historical sources, including forfeiture laws and the practice of disarming loyalists, justify disarming felons under that statute. *See* Brief of Appellee, *United States v. Staten*, No. 10-5318, 2011 WL 1542053, at *25-26 (4th Cir. Apr. 25, 2011) (explaining that although "Colonial societies do not appear to have categorically prohibited" felons' firearm possession, "some felony offenders were disarmed by application of the forfeiture rules inherited from English law"). And in *United States v. Pettengill*, which concerned the constitutionality of 18 U.S.C. § 922(g)(9), the government did not argue that Section 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified," ROA.303 (quotation omitted), but was instead quoting the First Circuit's own statements about Section 922(g)(1). *See* Brief of Appellee, *United States v. Pettengill*, No.10-2024, 2011 WL 1977759, at *27-28 (1st Cir. May 13, 2011) (quoting *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011)). The government nevertheless maintained that Section 922(g)(1) has some "historical predicates." *Id.* at *27 (quotation omitted).

Bullock contends (Resp. Br. 40) that historical laws authorizing capital punishment for some felonies are inadequate analogues for Section 922(g)(1)'s "total and permanent ban" on firearm possession. But capital punishment and estate forfeiture laws are "relevantly similar"[5] to Section 922(g)(1) because each prevents a person from possessing firearms, potentially permanently. *Bruen*, 597 U.S. at 29. Capital punishment and estate forfeiture laws did so indirectly, by either depriving felons of their lives or requiring them to forfeit all their possessions. But these differences do not render the analogues irrelevant under *Bruen*. *Bruen* does not require a "historical twin*,*" *id*. at 30 (emphasis omitted), and capital punishment effectively worked as a lifetime ban on firearm possession for felons in any event.

Bullock incorrectly claims that "the historical evidence disproves the Government's general assertions regarding capital punishment and estate

---

[5] Bullock contends (Resp. Br. 21-22) that *Bruen* sets out "two standards" for analogical reasoning under the Second Amendment: a more demanding "distinctly similar" standard, and a more lax "relevantly similar" standard. But *Bruen* did not set out a two-tiered test of the sort Bullock suggests. Rather, *Bruen* identified guideposts for "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. These guideposts are all part of a single test for deciding if a modern regulation is "analogous enough" to "historical precursors" to "pass constitutional muster." *Id*. at 30. Indeed, *Bruen* used "distinctly similar" just once. *Id.* at 26. And when it did, it described "the lack of a distinctly similar historical regulation" only as "relevant evidence," not as dispositive of the historical inquiry. *Id*.

forfeiture." Resp. Br. 37. Contrary to his claim, the 1790 federal crimes statute was not "an outlier" in authorizing capital punishment for felonies. Resp. Br. 38. In fact, capital punishment was "'the standard penalty for all serious crimes'" in the late 18th century. *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). The fact that many jurisdictions were moving away from the death penalty "[b]y the early 19th century," Resp. Br. 38, does not at all suggest that capital punishment was uncommon in 1791 or that the ratifiers of the Second Amendment believed it beyond the power of Congress or the states to impose. Indeed, the historical record shows quite the opposite.

Nor is Bullock correct to suggest (Resp. Br. 38) that estate forfeiture was not an authorized punishment at the time of the founding simply because the First Congress abolished it for federal offenses. Many American jurisdictions up through the late 1780s continued to enact laws authorizing forfeiture of a felon's estate. *See* Gov't Opening Br. 29 n.7; Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014). The fact that the First Congress did away with estate forfeiture for federal offenses in fact confirms that estate forfeiture was common enough in the states that Congress needed to specifically address it.

Bullock suggests (Resp. Br. 37-39) that the government's reliance on felony punishment laws is undermined by the fact that there was no agreed-upon definition of "felony" at the time of the founding, and that then, as now, a variety of crimes of varying seriousness are punished as felonies. This does not matter. As noted above, at least one of Bullock's felonies (manslaughter) has *always* been a felony, even under the narrow common-law list of crimes. And Section 922(g)(1) does not use the term "felony," but applies to offenses "punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1); *see* 18 U.S.C. § 921(a)(20) (defining that term). In interpreting other provisions of the Bill of Rights, the Supreme Court has routinely considered the "maximum authorized penalty" to "provide[] an 'objective indication of the seriousness with which society regards the offense.'" *Lewis v. United States*, 518 U.S. 322, 328 (1996) (brackets omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. *See Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-45 (1989). Courts can similarly rely on the

authorized punishment when considering whether modern crimes are analogous to the crimes punished most seriously at the founding.

Bullock wrongly suggests that the government cites only "two additional colonial statutes" beyond those dealing with capital punishment and forfeiture. Resp. Br. 40. In fact, the government's brief cited numerous colonial statutes, including laws disarming loyalists who refused to swear allegiance, those who rode to the terror of the people, and those who committed certain offenses such as unsafe storage of guns and gunpowder. Gov't Opening Br. 30-33 & nn.8-11. The government also cited additional laws from the 19th century, including surety statutes and laws disarming minors, those of unsound mind, vagrants, and intoxicated persons. Gov't Opening Br. 35-38 & nn.12-17. This case is thus a far cry from *Bruen*, in which the Supreme Court "doubted that three colonial-era laws could suffice to show a tradition." Resp. Br. 41 (quotation omitted).

D. <u>At a minimum, there is a historical tradition for disarming dangerous felons, like Bullock.</u>

As the government argued below (ROA.195) and in its opening brief (at 40-42), there is a historical tradition for disarming dangerous felons such as Bullock, who has convictions for multiple violent felonies, including manslaughter, aggravated assault, attempted aggravated assault, and fleeing a law-enforcement officer.

Bullock makes little attempt to rebut the government's argument regarding dangerousness. Resp. Br. 41-42. He parrots the district court's conclusion that the government failed to establish a historical tradition of disarming the dangerous. Resp. Br. 42. And he criticizes the government's historical analogues as being "often . . . based in a fear of minorities," "intended to limit the rights of people that the Founders did not find worthy," and "intended to preserve 'the political and social order.'" Resp. Br. 41 (quoting *Rahimi*, 61 F.4th at 456-57). But he fails to grapple with the larger point that "[h]istory . . . demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). That is the consensus even among those judges and commentators who have incorrectly maintained that *only* dangerous felons may be disarmed. *See id.* at 451-55 (Barrett, J., dissenting); *Rahimi*, 61 F.4th at 464 (Ho, J., concurring) (agreeing that "the government can presumably disarm dangerous convicted felons, whether they're incarcerated or not, without violating the Second Amendment"); *Binderup v. Att'y Gen.*, 836 F.3d 336, 368-69 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public."); *United States v. Jackson*, 85 F.4th 468, 476 (8th Cir. 2023) (Stras, J.,

dissenting from denial of rehearing) (Mem.) (explaining that "[d]isarmament is about dangerousness"); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 272 (2020) (observing that in "each [relevant] historical period," "violent or otherwise dangerous persons could be disarmed"). Bullock fails to point to a single appellate judge or commentator disagreeing with that position.

Bullock briefly contends (Resp. Br. 6, 42) that he is not dangerous. He first points to the magistrate judge's determination at his detention hearing that he was eligible for release pending trial. Resp. Br. 6. But the determination that Bullock did not present a sufficiently serious threat of danger to his wife or the community to warrant detaining him, *see* 18 U.S.C. § 3142(g), has no bearing on whether his felony convictions were dangerous and violent enough to justify Congress's determination that he should be disarmed. Detention is a far more serious restriction on liberty than a prohibition on firearm possession.[6]

Bullock also suggests that the government improperly "uses the general terminology for [his] prior convictions to identify him as dangerous." Resp. Br. 41. The government's reliance on his record was entirely appropriate, and that record demonstrates that he poses a danger when armed. At the time of his

---

[6] As a condition of his release, the magistrate judge ordered that Bullock not possess firearms on his person or in his home. *See* ROA.377.

arrest, Bullock had at least four prior felony convictions. *See* ROA.386-387. The first two were 1994 convictions for manslaughter and aggravated assault stemming from a deadly bar fight in which Bullock shot an unarmed bar bouncer in the abdomen and, after firing "a barrage of bullets" into a crowd, killed a 19-year-old passerby. ROA.386, 391-392. Bullock was sentenced to 20 years of imprisonment. ROA.386. In 2015, Bullock was convicted of attempted aggravated assault against a law enforcement officer and fleeing from law enforcement. ROA.387. Bullock's criminal history demonstrates that he is exactly the kind of person that Congress could reasonably "classif[y] as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). The district court erred by concluding otherwise.

## CONCLUSION

This Court should reverse the district court's order dismissing the indictment against Bullock.

Respectfully submitted,

TODD W. GEE
United States Attorney

GAINES CLEVELAND
Appellate Chief

JENNIFER CASE
Deputy Appellate Chief
Southern District of Mississippi

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

December 21, 2023

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,478 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

/s/ Mahogane D. Reed
MAHOGANE D. REED